UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JAMES YORK, *et al.*,<br><br>Defendants. | 1:16-cr-00069-LJO-SKO-11<br><br>**MEMORANDUM DECISION AND ORDER DENYING DEFENDANTS' MOTIONS TO SUPPRESS THE WIRETAPS**<br><br>**(ECF Nos. 311, 323, 325, 329, 331, 332, 345, 350, 353, 354, 355, 357, 359, 362, 363, 364, 368, 369, 372, 375, 379, 380, 386, 389, 392, 394, 431, 436, 446, 448, 451, 452)** |

## I. INTRODUCTION

Defendants[1] moved to suppress the results of the wiretap interceptions in this case, arguing that

---

[1] Seventeen of the eighteen defendants indicted in this case either filed a suppression motion or joined in co-defendants' motions (or both). The following defendants filed motions to suppress the wiretaps: Markeith Canady (ECF No. 311), Davon Millro (ECF No. 323), Anthony Windfield (ECF No. 329), James York (ECF No. 331), Steven Blackmon (ECF No. 332), Trenell Monson (ECF No. 345), Darrell Maxey (ECF No. 353), Kiandre Johnson (ECF No. 363), and Kenneth Wharry (ECF No. 368). Defendants Marvin Larry (ECF No. 325), William Lee (ECF Nos. 350, 451), Deandre Stanfield (ECF No. 359), Kenneth Johnson (ECF No. 362), Luther Newsome (ECF No. 364), Natasha Parks (ECF No. 369), Sharika Gaines (ECF Nos. 372, 452), and Aquilla Bailey (ECF Nos. 375, 386) filed motions joining some or all of co-defendants' motions to suppress the wiretaps. Several defendants who filed separate wiretap motions also joined co-defendants' wiretap motions and/or reply briefs: Davon Millro (ECF No. 389), Anthony Windfield (ECF No. 392), Trenell Monson (ECF No. 431), James York (ECF Nos. 380, 436), Kiandre Johnson (ECF No. 446), and Markeith Canady (ECF Nos. 394, 448). Defendant Kevin Packard was not intercepted as a result of the wiretaps and does not move to suppress the wiretaps. Packard was in custody at Fresno County Jail during the relevant period, and his communications were obtained via recordings of calls over the phones provided at the facility.

1

1  the affidavits submitted in support of the wiretap orders lacked probable cause and failed to show the

2  exhaustion of other investigative techniques (necessity). Defendants also requested a *Franks* hearing,

3  arguing that the Government intentionally or recklessly included false statements and omitted material

4  information in their wiretap applications.

5       For the reasons set forth below, these motions are DENIED.

6  ## II. BACKGROUND

7  **A.**   **Initial Investigation**

8       In June of 2014, the Fresno Police Department ("FPD") launched an investigation into the Dog

9  Pound Gangsters ("DPG"), a criminal street gang operating in Fresno County. (Wiretap Affidavit No.

10  16-001, ECF No. 313-1 ("16-001") at 9; Indictment ¶¶ 2, 8.) The DPG was suspected of involvement

11  with a number of recent murders and shootings, as well as ongoing human trafficking and credit card

12  fraud schemes. (*Id.*) FPD officers ultimately met with other state and federal law enforcement agencies

13  for assistance with the investigation. (*Id.*)

14  **B.**   **Wiretap Investigation**

15       In early 2016, the FPD and the California Department of Justice Special Operations Unit

16  launched a wiretap investigation into the DPG. (Complaint ¶ 74.) The initial wiretap affidavit, drafted by

17  FPD homicide Sergeant Andre Benson, sought approval to intercept telephone calls for six target

18  telephones. In the affidavit, which spanned over 200 pages, Sergeant Benson summarized the

19  background of the DPG, the FPD's substantial attempts (and failures) to target the DPG and reduce its

20  criminal activity in the community, and the FPD's probable cause and necessity for intercepting the

21  initial six targets. (Affidavit in Support of Wiretap 16-001, ECF No. 313-2.[2]) The initial wiretap was

22  authorized on February 15, 2016. (16-001 Order.) Thereafter, over the course of the next 65 days, agents

---

24  [2] Hereinafter, wiretap affidavits will be cited to by their number (i.e. "16-001," "16-002," etc.). They will be referred to in
text as "the 16-001 Affidavit," "the 16-002 Affidavit," etc. Wiretap orders will be cited to by their number (i.e. "16-001
Order,"), and referred to in text as "Wiretap 16-001," "Wiretap 16-002," etc. All wiretap affidavits, applications, and orders
relevant to this Order are available on the docket at ECF No. 313.

obtained 10 spinoff and renewal wiretaps. Each new wiretap application incorporated by reference all previous wiretap applications. During the investigation, agents intercepted the communications of more than 20 DPG members, associates, and co-conspirators, consisting of over 5,000 calls and/or texts related to DPG criminal activities. (ECF No. 2 ¶¶ 75, 94-762.) The following is a summary of the wiretap applications and authorizations that took place in this investigation:

| Wiretap Number | Target Telephone Number | Target Subject | Author Date and Affiant | Signing Date and Judge |
|---|---|---|---|---|
| 16-001 | TT#1 (559) 369-8454 | Tremayne Beard | 02/15/2016 Andre Benson | 2/15/2016 Arlan Harrell |
| 16-001 | TT#2 (559) 270-9612 | Trenell Monson | 02/15/2016 Andre Benson | 2/15/2016 Arlan Harrell |
| 16-001 | TT#3 (559) 403-3376 | Brandon Tucker | 02/15/2016 Andre Benson | 02/15/2016 Arlan Harrell |
| 16-001 | TT#4 (559) 546-2005 | Steven Blackmon | 02/15/2016 Andre Benson | 02/15/2016 Arlan Harrell |
| 16-001 | TT#5 (559) 380-9497 | Darrell Maxey | 02/15/2016 Andre Benson | 02/15/2016 Arlan Harrell |
| 16-001 | TT#6 (559) 417-6290 | Kenneth Johnson | 02/15/2016 Andre Benson | 02/15/2016 Arlan Harrell |
| 16-002 | TT#7 (559) 248-6050 | Trenell Monson | 02/22/2016 Michael Szatmari | 02/22/2016 Arlan Harrell |
| 16-002 | TT#8 (310) 365-5650 | La France Brown | 02/22/2016 Michael Szatmari | 02/22/2016 Arlan Harrell |
| 16-002 Extension | TT#7 (559) 248-6050 | Trenell Monson | 03/23/2016 Michael Szatmari | 03/23/2016 Arlan Harrell |
| 16-003 | TT#9 (559) 885-9977 | Darrell Maxey | 02/24/2016 Michael Szatmari | 02/24/2016 Arlan Harrell |
| 16-003 | TT#10 (559) 349-3486 | Rayquan Brown | 02/24/2016 Michael Szatmari | 02/24/2016 Arlan Harrell |
| 16-003 | TT#11 (559) 943-0572 | Kiandre Johnson | 02/24/2016 Michael Szatmari | 02/24/2016 Arlan Harrell |
| 16-003 | TT#12 (559) 430-6871 | Kenneth Wharry | 02/24/2016 Michael Szatmari | 02/24/2016 Arlan Harrell |
| 16-004 | TT#13 (559) 900-6013 | Tremayne Beard | 02/26/2016 Michael Szatmari | 02/26/2016 Arlan Harrell |
| 16-005 | TT#14 (702) 480-4270 | James York | 03/02/2016 Michael Szatmari | 03/02/2016 Arlan Harrell |
| 16-005 | TT#15 (559) 909-9941 | James York | 03/02/2016 Michael Szatmari | 03/02/2016 Arlan Harrell |
| 16-005 | TT#16 (559) 548-5570 | Davon Millro | 03/02/2016 Michael Szatmari | 03/02/2016 Arlan Harrell |
| 16-006 | TT#17 (559) 801-9466 | UM 486 | Daniel Sanchez | *Rejected* Arlan Harrell |

| | | | | |
|---|---|---|---|---|
| 16-007.1 | TT#18 (559) 400-3014 | Natasha Parks | 03/12/2016<br>Daniel Sanchez | 03/12/2016<br>Arlan Harrell |
| 16-008 | TT#19 (559) 312-8956 | Akili Foster | Daniel Sanchez | *Rejected*<br>Dennis Peterson |
| 16-009 | TT#6 (559) 417-6290 | Kenneth Johnson | 03/25/2016<br>Michael Szatmari | 03/25/2016<br>Arlan Harrell |
| 16-010 | TT#9 (559) 885-9977 | Darrell Maxey | 03/30/2016<br>Michael Szatmari | 03/30/2016<br>Arlan Harrell |
| 16-010 | TT#11 (559) 943-0572 | Kiandre Johnson | 03/30/2016<br>Michael Szatmari | 03/30/2016<br>Arlan Harrell |
| 16-010 | TT#12 (559) 430-6871 | Kenneth Wharry | 03/30/2016<br>Michael Szatmari | 03/30/2016<br>Arlan Harrell |
| 16-011 | TT#15 (559) 909-9941 | James York | 04/01/2016<br>Michael Szatmari | 04/01/2016<br>Arlan Harrell |
| 16-011 | TT#16 (559) 548-5570 | Davon Millro | 04/01/2016<br>Michael Szatmari | 04/01/2016<br>Arlan Harrell |
| 16-012 | TT#20 (703) 283-1262 | Trenell Monson | 04/15/2016<br>Michael Szatmari | 04/15/2016<br>Arlan Harrell |
| 16-012 | TT#21 (559) 387-0718 | Markeith Canady | 04/15/2016<br>Michael Szatmari | 04/15/2016<br>Arlan Harrell |
| 16-012 | TT#22 (559) 400-5964 | Markeith Canady | 04/15/2016<br>Michael Szatmari | 04/15/2016<br>Arlan Harrell |
| 16-012 | TT#23 (559) 363-9470 | Kenneth Wharry | 04/15/2016<br>Michael Szatmari | 04/15/2016<br>Arlan Harrell |
| 16-012 | TT#24 (559) 795-9987 | Kitteran Patton | 04/15/2016<br>Michael Szatmari | 04/15/2016<br>Arlan Harrell |
| 16-013 | TT#25 (559) 358-6912 | Akili Foster | 04/15/2016<br>D. Sanchez | 04/15/2016<br>Arlan Harrell |

The Court will discuss the details of the challenged wiretap affidavits and orders in its analysis of Defendants' motions to suppress.

**C.    Criminal Complaint and Indictment**

On April 17, 2016, the Government filed a 258-page criminal complaint against 18 DPG members, associates, and co-conspirators. (ECF No. 2.) On May 5, 2016, a federal grand jury returned a 26-count indictment charging eighteen defendants, alleged to be members or associates of the DPG, with violating a variety of criminal statutes related sex trafficking and prostitution, conspiracy to commit access device fraud, and conspiracy to commit murder in aid of racketeering. (Indictment, ECF No. 127.)

**D.**    **Wiretap Suppression Motions**

The seventeen defendants whose communications were intercepted pursuant to wiretap orders argue that those communications should be suppressed, and any investigative leads based on those communications should be suppressed as fruit of the poisonous tree. Defendants also argue that they are entitled to a *Franks* hearing regarding material misstatements and omissions contained in the wiretap affidavits. The Government opposed all of Defendants' motions relating to wiretap suppression. (ECF No. 417.) Several Defendants filed reply briefs. (ECF Nos. 420, 427, 428, 437, 442, 445, 447.)

## III. RELEVANT STATUTES

In evaluating the validity of a wiretap issued in state court, the Court applies both federal law and state law. Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("Title III") governs the use of electronic surveillance. 18 U.S.C. § 2516(2) governs the validity of state-issued wiretap orders, like those found in this case. 18 U.S.C. §§ 2515 and 2518 address when wiretap evidence must be suppressed and how and when a defendant may move to suppress such wiretap evidence.

**A.**    **18 U.S.C. § 2516(2)**

Title III established the procedures by which law enforcement officials can obtain judicial authority to intercept wire and oral communications. The federal wiretap statute permits states to authorize the interception of wire communications. *See* 18 U.S.C. § 2516(2). State laws must meet the minimum standards of Title III. Section 2516(2) states, in pertinent part, that:

> The principal prosecuting attorney of any State, or the principal prosecuting attorney of any political subdivision thereof, if such attorney is authorized by a statute of that State to make application to a State court judge of competent jurisdiction for an order authorizing or approving the interception of wire, oral, or electronic communications, may apply to such judge for, and such judge may grant in conformity with section 2518 of this chapter . . . .

18 U.S.C. § 2516(2). California Penal Code § 629.50(a) authorizes a district attorney, or person designated to act as district attorney in the district attorney's absence, to apply for an order authorizing the interception of a wire or electronic communication.

5

**B.     18 U.S.C. §§ 2515, 2518**

Under Section 2515, "if the disclosure of [intercepted communications] would be in violation of this chapter," the communications must be suppressed upon a motion properly made under Section 2518(10)(a). *See United States v. Giordano*, 416 U.S. 505, 508 (1974). Section 2518 provides three bases for suppression, including suppression of the wiretap evidence on the grounds that it was "unlawfully intercepted." Here, Defendants contend that the communications were unlawfully intercepted pursuant to an invalid state wiretap order.

Sections 2515, 2516(2), and 2518 do not address what law governs admissibility of evidence obtained under state law procedures; section 2516(2) requires only that the wiretap order be obtained in conformity with state law. The Ninth Circuit has held that federal law governs the admissibility of wiretap evidence. "Evidence obtained pursuant to a state court wiretap authorization is not subject to suppression in federal court if that evidence was obtained in compliance with federal law." *United States v. Homick*, 964 F.2d 899, 903 (9th Cir. 1992) (citing *United States v. Chavez–Vernaza*, 844 F.2d 1368, 1372 (9th Cir. 1987)). Therefore, although the validity of the wiretap is governed by both federal and state law, it will only be suppressed if it was obtained in violation of federal law. *Id.*; *see also United States v. Chavez-Vernaza*, 844 F.2d 1368, 1373 (9th Cir. 1987) ("we have consistently stated that the admissibility of evidence obtained in violation of state law turns on whether a federal right has been infringed, not on the presence or absence of federal involvement at the evidence-gathering stage of an investigation"); *United States v. Hall*, 543 F.2d 1229, 1235 (9th Cir. 1976) ("wiretap evidence obtained in violation of neither the Constitution nor federal law is admissible in federal courts, even though obtained in violation of state law").[3]

---

[3] Defendants argue, relying on *United States v. Butz*, that state law governs the admissibility of evidence gathered pursuant to state wiretap orders. 982 F.2d 1378, 1382 (9th Cir. 1993). In *Butz*, defendants moved to suppress evidence derived from pen registers, as well as wiretap evidence that was obtained by relying on the pen register information. The court found that the pen register orders, though obtained in violation of state law, were relied on by the officers in good faith. *Id.* Therefore, the court upheld the wiretap evidence as admissible and did not reach the question of whether state law applied to the wiretaps. *Id.* However, defendants point out the court in dicta implicitly relied on the assumption that the wiretaps

# IV. <u>STANDING</u>

The Government first argues that Defendant Deandre Stanfield[4] lacks standing to challenge the wiretap because he was incarcerated during the period where his communications were being intercepted, and the intercepted communications took place over a contraband cellular phone that he possessed in prison. The Government concedes that all of the other Defendants challenging the wiretaps have standing to do so. (ECF No. 417 at 49.) Therefore, the Court will only address Stanfield's standing.

The Fourth Amendment protects communications in which a person has a reasonable expectation of privacy. California Penal Code, Section 4576 prohibits a prisoner from possessing a cellular telephone. Therefore, Stanfield could have no reasonable expectation of privacy in communications that took place over his contraband cellular telephone. *United States v. Huart*, 735 F.3d 972, 976 (7th Cir. 2013) (subject in halfway house following prison surrendered any expectation of privacy in the contents of his cell phone); *see also United States v. Rodriguez*, No. 13CR4514-BEN, 2015 WL 468358, at *1 (S.D. Cal. Feb. 3, 2015) (*"*No court has ruled that a prison inmate has a reasonable expectation of privacy for communications he makes by cellular telephone."). Stanfield lacks standing to challenge the validity of the wiretaps order and to request suppression.

Defendant argues that regardless of whether his Fourth Amendment rights were violated, he still had a statutory right to privacy under Title III of the Omnibus Crime Control and Safe Streets Act, which is not limited by his imprisonment. (ECF No. 427.) The Court agrees with the holding in *Rodriguez*, where the Court concluded that Title III does not apply to law enforcement interceptions of

---

[4] could have been suppressed in federal court for violating state law had the officers not been acting in good faith. *Id.* This inference, based on dicta and not directly on point, does nothing to contravene the well-established precedent that evidence is not subject to suppression in federal court unless it was collected in violation of federal law. *Homnick*, 964 F.2d at 903. The Supreme Court has been clear that suppression "is required only for a 'failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device.'" *United States v. Donovan*, 429 U.S. 413 (1997) (quoting *Giordano*, 416 U.S. at 527). Therefore, unless the interception was in violation of a core concern of Title III, it is not subject to suppression in federal court.

[4] This defendant is alternately referred to as Deandre Stanfield and Deandre Stanfill in various filings. Consistent with the spelling used by Defendant's attorney, the Court will refer to this Defendant as Deandre Stanfield.

1   communications made on contraband prison cell phones. 2015 WL 468358, at *3-4 ("It would be an

2   ironic interpretation of the law to find that a prison inmate, who by virtue of his initial crime and

3   conviction, when he is placed in a cellblock where he has *no* Fourth Amendment rights, and when he

4   commits a further crime by obtaining and using a contraband cellular telephone, acquires a statutory

5   right under Title III to be free from law enforcement eavesdropping, unless a Title III wiretap order is

6   first obtained").

7       Therefore his joinder in co-defendants' motions to traverse and controvert the affidavits and

8   quash wiretap search warrants, suppress all evidence obtained as a result of those search warrants, and

9   for a *Franks* hearing is DENIED.

10   ### V. <u>STANDARD OF DECISION</u>

11      The authority conferred under Title III for law enforcement agencies to conduct electronic

12   surveillance of suspected criminal activities "is not a blank check." *United States v. Garcia-Villalba*,

13   585 F.3d 1223, 1227 (9th Cir. 2009).  The Government must generally satisfy two requirements before a

14   district court will issue a wiretap order: probable cause and necessity. *Id.* [5]

15   **A.      <u>Probable Cause</u>**

16       18 U.S.C. § 2518(3) allows courts to authorize wiretaps if an applicant shows probable cause

17   that: an individual is committing, has committed, or is about to commit specified offenses;

18   communications relevant to that offense will be intercepted through the wiretap; and the individual who

19   is the focus of the wiretap investigation will use the tapped phone. 18 U.S.C. § 2518(3)(a), (b), (d).

20   Courts will uphold a wiretap if, looking only at the four corners of the application, "there is a

21   'substantial basis' for these findings of probable cause." *United States v. Meling*, 47 F.3d 1546, 1552

22   (9th Cir. 1995) (citations omitted).

23   _____

24   [5] We apply federal law to the analysis of state wire taps in federal court. *Homnick*, 964 F.2d at 903. Nonetheless, the state law standard is virtually identical. *See.* Cal. Penal Code § 629.50 (requiring that the affiant state "details as to the particular offense that has been, is being, or is about to be committed" and requiring the affiant to provide a "full and complete

25   statement" of the "fact that conventional investigative techniques had been tried and were unsuccessful, or why they reasonably appear to be unlikely to succeed or to be too dangerous").

In *Illinois v. Gates,* the Court noted that "probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." 462 U.S. 213, 232 (1983). In adopting the totality of the circumstances test, the Court repeatedly emphasized that it was rejecting any rigid or technical approach to the determination of probable cause. *Id.* at 230-38.

When applying the totality of the circumstances test,

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*Id.* Moreover, the Supreme Court has indicated that "'only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause.'" *Id.* at 235 (quoting *Spinelli v. United States*, 393 U.S. 410, 419 (1969)).

The task of a court reviewing a probable cause determination made by an authorizing judge is simply to ensure that the issuing judge or magistrate had a *substantial basis* for concluding that probable cause existed. *Id.* (emphasis added). A finding of probable cause by the issuing judge or magistrate must be upheld unless it is clearly erroneous. *United States v. McQuisten*, 795 F.2d 858, 861 (9th Cir. 1986). Additionally, the Supreme Court has indicated that while determinations of whether an affidavit demonstrates the existence of probable cause will often be difficult, the resolution of doubtful or marginal cases should be determined largely by the preference to be accorded to warrants. *Massachusetts v. Upton*, 466 U.S. 727, 734 (1984).

**B.     Necessity**

"The government must show that every wiretap it seeks is necessary." *United States v. Christie*, 825 F.3d 1048, 1066 (9th Cir. 2016). Under 18 U.S.C. § 2518(1)(C), a wiretap application must include a "full and complete statement" as to whether traditional investigative procedures (1) have been tried and failed; (2) reasonably appear unlikely to succeed if tried; or (3) are too dangerous to try. 18 U.S.C. §

2518(l)(c); *see also* 18 U.S.C. 2518(3)(c). The district court may authorize a wiretap order only if it

determines on the basis of the facts submitted by the Government that "normal investigation procedures

have been tried and have failed or reasonably appear to be unlikely to succeed or are to be too

dangerous."  18 U.S.C. § 2518(3)(c). "Taken together, §§ 2518(1)(C) and (3)(c) require a showing of

necessity before a district court can issue a wiretap order." *United States v. Carneiro*, 861 F.2d 1171,

1176 (9th Cir. 1988). The purpose of such requirements is "to ensure that wiretapping is not resorted to

in situations where traditional investigative techniques would suffice to expose the crime." *United States*

*v. Blackmon*, 273 F.3d 1204, 1207 (9th Cir. 2001) (citations omitted).

The Ninth Circuit describes the necessity analysis as a two-step approach. *United States v.*

*Rodriguez*, 851 F.3d 931, 937 (9th Cir. 2017). First, the reviewing court reviews *de novo* whether the

application contains a full and complete statement as to whether or not "other investigative procedures

have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too

dangerous." *Id.* at 938. If the wiretap application meets these requirements, then the court reviews the

issuing court's conclusion that the wiretap was necessary for abuse of discretion. *Id.*

Law enforcement "need not exhaust every conceivable alternative before obtaining a

wiretap." *United States v. McGuire*, 307 F.3d 1192, 1196-97 (9th Cir. 2002). "The statute does not

mandate the indiscriminate pursuit to the bitter end of every non-electronic device as to every telephone

and principal in question to a point where the investigation becomes redundant or impractical or the

subjects may be alerted and the entire investigation aborted by unreasonable insistence upon forlorn

hope." *United States v. Baker*, 589 F.2d 1008, 1013 (9th Cir. 1979). Rather, the purpose of the

requirement is to ensure that investigators use the tool of electronic surveillance "with restraint" and not

as the "initial step in criminal investigations." *United States v. Giordano*, 416 U.S. 505, 515 (1974). A

judge authorizing "a wiretap has considerable discretion" as to necessity, and necessity findings are

reviewed for abuse of discretion. *McGuire*, 307 F.3d at 1197. The Ninth Circuit has consistently

employed a "common sense approach" to necessity, reaffirming that "law enforcement officials need not

1  exhaust every conceivable alternative before obtaining a wiretap." *United States v. Rivera*, 527 F.3

2  891, 902 (9th Cir. 2008) (citations omitted).

3      Nonetheless, "*each* wiretap application, standing alone, must satisfy the necessity requirement."

4  *Carneiro*, 861 F.2d at 1176 (emphasis in original). Therefore, in considering a motion to suppress, the

5  reviewing court "must examine each wiretap application separately and may look only to information in

6  the relevant affidavit to determine whether it contains a full and complete statement of facts under

7  § 2518(1)(c)." *Rodriguez*, 851 F.3d at 938.

8  **C.   *Franks* Hearing**

9      Under *Franks v. Delaware*, 438 U.S. 154 (1978), a defendant is entitled to an evidentiary hearing

10  regarding the veracity of an affidavit supporting an application "if he can make a substantial preliminary

11  showing that the affidavit contain[ed] intentionally or recklessly false statements, and . . . [that] the

12  affidavit purged of its falsities would not be sufficient to support a finding of probable cause." *United*

13  *States v. Meling*, 47 F.3d 1546, 1553 (9th Cir. 1995) (citation omitted).

14      The Supreme Court explained the role of misrepresentations in affidavits as follows:

15          There is, of course, a presumption of validity with respect to the affidavit
           supporting the search warrant. To mandate an evidentiary hearing, the
16          challenger's attack must be more than conclusory and must be supported
           by more than a mere desire to cross-examine. There must be allegations of
17          deliberate falsehood or of reckless disregard for truth, and those
           allegations must be accompanied by an offer of proof. They should point
18          out specifically the portion of the warrant affidavit that is claimed to be
           false; and they should be accompanied by a statement of supporting
19          reasons . . . . [I]f these requirements are met, and if, when material that is
           the subject of the alleged falsity or reckless disregard is set to one side,
20          there remains sufficient content in the warrant affidavit to support a
           finding of probable cause, no hearing is required.

21  *Franks*, 438 U.S. at 171-72. The Ninth Circuit expanded upon *Franks*, setting out a five-prong test that a

22  defendant must meet to justify a *Franks* hearing:

23          (1) the defendant must allege that specifically which portions of the
           warrant affidavit are claimed to be false; (2) the defendant must contend
24          that the false statements or omissions were deliberately or recklessly
           made; (3) a detailed offer of proof, including affidavits, must accompany

25

the allegations; (4) the veracity of only the affiant must be challenged; (5)
the challenged statement must be necessary to find probable cause.

*United States v. Perdomo*, 800 F.2d 916, 920 (9th Cir. 1986) (internal citation omitted). *Franks* applies

to omissions as well as false statements. *Id.* "To be entitled to a *Franks* hearing, a defendant must make

a "two-fold showing: intentional or reckless inclusion or omission, and materiality." *United States v.*

*Bennett*, 219 F.3d 1117, 1124 (9th Cir. 2000). *Franks* hearings are not "obtainable on a bare allegation

of bad faith." *United States v. Chesher*, 678 F.2d 1353, 1360 (9th Cir. 1982). And "[i]n doubtful cases,

preference should be given to the validity of the warrant." *United States v. Burnes*, 816 F.2d 1354, 1357

(9th Cir. 1987) (quotation marks and citations omitted).

## VI. <u>ANALYSIS OF SUPPRESSION MOTIONS</u>

Defendants challenge the wiretap orders in this case on four primary grounds. First, the affidavits

were not supported by probable cause. Second, and relatedly, that some of the evidence put forth in

support of probable cause contained intentional or reckless misstatements and omissions, and therefore

that they are entitled to a *Franks* hearing. Third, the wiretap applications lacked "a full and complete

statement" of the investigative procedures undertaken prior to seeking a wiretap and that the wiretaps

were not necessary to prosecute defendants successfully. Lastly, the wiretap orders are invalid as a result

of technical deficiencies. Cognizant of its obligation to review each wiretap application separately,

*Rodriguez*, 851 F.3d at 938, the Court will first address the probable cause, necessity, and *Franks*

challenge arguments as they pertain to each wiretap order issued in this case. After those issues have

been addressed, the Court will turn to the various technical and miscellaneous challenges that affect all

of the wiretap orders.

**A.** <u>**Wiretap 16-001**</u>

Wiretap 16-001 was authorized on February 15, 2016 by Fresno County Superior Court Judge

Arlan Harrell. FPD Sergeant Andre Benson was the affiant on the application. The 208-page Affidavit

sought authorization to intercept communications for six target cellular phones ("Target Telephones" or

1    "TT") identified as belonging to six individuals ("Target Subjects"), including Defendants Trenell

2    Monson (using TT#2), Darrell Maxey (using TT#5), Steven Blackmon (using TT#4), and Kenneth

3    Johnson (using TT#6). The affiant described the DPG, its history of criminal activity, and the FPD's

4    attempts to target and prosecute those individuals and the DPG. (16-001.) The Affidavit also identified a

5    litany of offenses ("Target Offenses") that it believed that the Target Subjects had committed, were

6    committing, or would commit, and why they believed such offenses would be discussed in intercepted

7    communications. The Target Offenses listed in the 16-001 Affidavit and incorporated in each

8    subsequent affidavit were: California Penal Code §§ 187 (murder), 245 (felony assault with a deadly

9    weapon), 29800 (unlawful possession of a firearm), 236.1 (human trafficking), 266h (pimping and

10   pimping a minor), 266i (pandering and pandering with a minor), 136.1 (dissuading a witness or victim),

11   503.5 (identity theft), and H&S §§ 11378 (possession for the purpose of sales of a controlled substance)

12   and 11359 (possession for the purposes of sales of cannabis), as well as California Penal Code § 186.22

13   (committing offenses in furtherance of a criminal street gang). (16-001:6-7.)

14       **1.   Probable Cause**

15           **a.   Defendant Monson**

16       Defendants challenge the first wiretap order issued in this case, Wiretap 16-001, on the basis the

17   16-001 Affidavit did not establish probable cause as to Defendant Monson, who was associated with

18   TT#2.

19       The probable cause offered by the Affidavit in support of intercepting Monson's

20   communications relies, in part, on a 2014 incident in which Monson was arrested on suspicion of having

21   been an accessory to murder. (16-001:147-48.) According to the Affidavit, officers believed that

22   Monson was located in the vicinity of a murder when it was occurring and then again in the vicinity of

23   where the suspect's vehicle was left and set on fire. Later that day, Monson met with two other

24   individuals, one of whom was ultimately charged in the shooting death, although those charges were

25   later dismissed. Based on his location throughout the period, officers believed that Monson was involved

13

in coordinating and/or overseeing the homicide. A state court judge determined that there was not enough evidence of Monson's involvement in a preliminary hearing, effectively determining that there was not probable cause to justify holding Monson to answer to the murder charges. The Affidavit disclosed the fact that the judge who heard the preliminary hearing found insufficient evidence to hold Monson to answer for the charges. (*Id.*)

If this were the only evidence offered to support a finding of probable cause as to Monson, the Court would be inclined to agree with Defendants that the 16-001 Affidavit was not supported by probable cause. However, the Court looks not to whether each individual fact offered independently supports probable cause, but rather to the totality of the evidence offered. *United States v. Valdez-Pacheco*, 935 F.2d 277 (9th Cir. 1991) (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983)); *see also United States v. Stevens*, 800 F. Supp. 892, 904 (D. Haw. 1992) (defendant's "attempt to attack each individual piece of evidence as insufficient to support a finding of probable cause ignores the Supreme Court's mandate to consider all the evidence as a whole in a practical manner"). Here, the Affidavit offered significant evidence that Monson was committing and had committed pimping and human trafficking offenses, that communications relevant to those offenses would be intercepted through the wiretap, and that the Monson would use the tapped phone.

The Affidavit details Monson's association with the DPG. (16-001:16.) Monson is a validated member of the DPG. (*Id.*) Monson also had a prior conviction for pimping for prostitution a minor over 16 years of age. (16-001:17.) The Affidavit also described a recent incident in which Monson was stopped in his vehicle while transporting a suspected prostitute. (16-001:86-87.) Monson was found in possession of $2,800 cash, and several identification cards and debit cards of women believed to be prostitutes working for Monson. (*Id.*) Further investigation revealed that at least two of those prostitutes had tattoos identifying them as prostitutes working for Monson. (*Id.*) The affiant further alleges that Monson made a statement to one of the responding male officers that he would like to "pimp out" one of the responding female officers, although Monson denies making such a statement. (*Id.*) The Affidavit

1   also describes a video in which Monson identifies himself to another DPG member as a pimp. (16-

2   001:87-88.) The evidence provided suggests, at a minimum, that Monson was involved in pimping and

3   human trafficking.

4      The Affidavit also details the extensive efforts to confirm that Monson was using TT#2. A

5   confidential source indicated that he contacted Monson on that number, and pen registry data confirmed

6   that the confidential informant was communicating with TT#2. The number also matched CDCR parole

7   records and FPD records for Monson. (16:001:12, 156-57.)

8      Even if the Court gives no weight to Monson's alleged involvement in the 2014 homicide, the

9   16-001 Affidavit contained a substantial basis for finding probable cause to intercept Monson's cell

10   phone communications. The state court's probable cause finding was neither clearly erroneous nor close

11   to it.

12        **b.**  **Darrell Maxey**

13      Defendants contend that 16-001 lacks probable cause that Defendant Maxey was involved in

14   human trafficking, witness intimidation, or homicides. Specifically, Maxey argues in his motion that the

15   information proffered was stale, lacked facts upon which the affiant's conclusions were based, or were

16   based on the statements of uncorroborated anonymous sources. (ECF No. 354 at 8-11.)

17      Looking at the evidence put forth in the Affidavit on the whole, the Court concludes that there

18   was a substantial basis for finding probable cause that Maxey had committed or was committing

19   offenses contemplated by § 2516 (18 U.S.C. § 2518(3)(a)) and that he was likely to use his cell phone to

20   communicate about those crimes. In the 16-001 Affidavit, which spans more than 200 pages, the affiant

21   describes Maxey as a self-identified DPG member who had been recently arrested for identity theft and

22   being a gang member in possession of a loaded firearm. (16-001:21.) Maxey was ultimately convicted of

23   a violation of identity theft.

24      The Affidavit also describes Maxey's suspected involvement in witness intimidation with respect

25   to the murder of rival gang member Benzo Ford. The FPD's investigation identified the likely suspects

as DPG members Kevin Packard and Brandon Tucker. (16-001:76-77.) Maxey appeared with other DPG members in a rap video posted to Youtube and titled "We Da Mf Mob." The lyrics described shooting someone through a window and shooting someone in the head – the circumstances of Benzo Ford's murder. In the video, Maxey and others were jumping on the top of the decedent's mother's vehicle, which was parked in the driveway in front of her house where Ford was shot and killed. The video makes reference to people being shot and killed for "snitching." The term "snitching" is common slang for providing a statement to law enforcement regarding a crime. Shortly after, FPD responded to a call at the same residence after Maxey and other DPG members and associates showed up and threatened the family, in an effort to prevent them from cooperating with the murder investigation. (16-001:76-77.) At the time the 16-001 Affidavit was executed, the incidents were still under investigation and the affiant indicated that he believed the wiretap would yield information that would lead to a successful prosecution.

The Affidavit also offers significant evidence that Maxey was engaged in human trafficking. In particular, the affiant describes an event in 2014 in which Maxey was found in the company of an underage female prostitute during a traffic stop. (16-001:93-94.) The victim later told detectives that Maxey was her pimp. (*Id.*) The Affidavit also refers to recent 2016 Facebook posts where Maxey discusses pimping openly. (16-001:94.) Defendant's contention that the evidence was stale is without merit. Defendant cites to *United States v. Grant*, where the Ninth Circuit determined that the six month gap between a crime of violence and the search warrant to search for the gun used in the crime rendered the warrant invalid. 682 F.3d 827 (9th Cir. 2012). Here, the less than two-year gap between the human trafficking incidents and the wiretap application did not render the human trafficking evidence stale. Unlike the single incident of violence described in *Grant*, pimping or human trafficking is an ongoing offense. *See United States v. Greany*, 929 F.2d 523 (9th Cir. 1991) (concluding that a 2 year lapse in time from information establishing probable cause to warrant was not too much where criminal activity is one of a long-term nature). Moreover, the recent Facebook posts about human trafficking, coupled

1  with Maxey's membership in the DPG, a criminal gang known for its involvement with human

2  trafficking, further bolstered the inference that Maxey was involved in human trafficking.

3      The affiant attested that based on his experience in law enforcement generally, and the DPG

4  specifically, that he believed that Maxey and other defendants were likely to discuss their criminal

5  activity on their cellular phones. The Affidavit also documents how law enforcement observed Maxey

6  answer a call placed to using TT#5, thereby verifying that he used the cell phone. (16-001:160-61.)

7      The state court judge's finding that there was probable cause to intercept Maxey's

8  communications was certainly not clearly erroneous; there was substantial evidence of Maxey's

9  involvement in human trafficking, as well as other criminal activity.

10      **2.      Necessity**

11          **a.      Full and Complete Statement**

12      Defendants suggest that wiretap affiants did not include a full and complete statement of the

13  investigative techniques and procedures that law enforcement attempted before initiating the wiretap

14  application process.

15      Throughout the 16-001 Affidavit, the affiants detailed numerous attempts to investigate the DPG

16  through traditional methods. For example, officers interviewed witnesses to shootings and homicides

17  (16-001:49-60, 65-80), spoke to confidential informants (16-001:169-75, 202), conducted surveillance

18  (16-001:175-85), conducted trash pulls at multiple addresses between on or about January 8, 2015

19  through October 28, 2015 (16-001:97-137, 192-96), coordinated with multiple law enforcement agencies

20  (16-001:80-84), executed search warrants (16-001:197-201), conducted pen register, toll, and location

21  monitoring analysis (16-001:185-86), conducted "sting operations" (16-001:202), collected DNA

22  evidence (16-001 202-203), monitored social media accounts (16-001:203), and consulted expert

23  witnesses (16-001:43-49). The affiant also describes the case-specific limitations on these methods. For

24  example, while the agents had some success in conducting surveillance on DPG members, DPG

25  members tended to be fairly conscious of surveillance, and even conducted counter-surveillance to

1    identify what agents might be following them. Therefore, the effectiveness of surveillance was limited.

2    (16-001:2, 148, 178.) Similarly, while trash pulls had been used effectively to discover evidence of

3    identity and credit card fraud of certain DPG members, certain other potential targets lived in areas

4    where trash pulls were not feasible, such as apartment complexes where trash was disposed of in a

5    communal dumpster. (16-001:195-96.)

6         Defendants argue that the Affidavit is supported by boiler plate assertions and therefore the does

7    not contain a "full and complete statement" specific to the case. The affiant provides a number of case-

8    specific details on the investigative procedures that were attempted, including the use of search warrants

9    and interviews. (16-001:197-204.) Although the Affidavit also uses some boiler plate language, the

10   Ninth Circuit has held that this "will not negate a finding of necessity if the affidavit, as a whole, alleges

11   sufficient facts demonstrating necessity." *United States v. Garcia Villalba*, 585 F.3d 1223, 1230 (9th

12   Cir. 2009) (quotation marks and citations omitted). Here, the 208-page Affidavit as a whole is extremely

13   detailed and specific, and the affiants go to great lengths to provide a full and complete statement of the

14   investigative techniques that have been used to try to advance the investigation of the Target Subjects,

15   and the DPG generally, over a period of years.

16        Defendant Blackmon argues that the 16-001 Affidavit did not offer a full and complete statement

17   because the affiant stated that he "set forth *the facts that I believe* are necessary and appropriate to

18   establish the foundation for an order authorizing interception." (ECF No. 333 at 55 (emphasis in

19   original) (citing 16-001).) Blackmon contends that the affiant essentially admitted that he was

20   selectively providing facts. However, a court must judge whether the affiant submitted a "full and

21   complete" statement using a "common sense" approach. *Rivera*, 527 F.3d at 902; *see also United States

22   v. Yeje-Cabrera*, 430 F.3d 1, 9-10 (1st Cir. 2005) ("[m]any aspects of an investigation, especially in a

23   large, complex case . . . , will not be relevant to the question of whether a particular wiretap is necessary.

24   And even if there is some relevance, the officer need not detail every single fact, so long as sufficient

25   facts are described as to the crucial issue and material contrary facts are not omitted"). The affiant

1   described the investigation techniques that law enforcement agents had attempted and considered over a

2   period of several years. The description was specific to the DPG and the Target Subjects. That is all that

3   18 U.S.C. § 2518(1)(c) requires.

4           **b.      Exhaustion/Necessity**

5           As explained above, the Affidavit provides extensive and case-specific detail regarding the

6   investigative measures used by law enforcement, as well as the methods that were not used because

7   agents believed that they would be ineffective or too dangerous to attempt. However, as the affiants

8   explained, they were unable to achieve their ultimate aim of dismantling the DPG gang through those

9   traditional investigative measure.

10          Defendants suggest a variety of investigative techniques that they contend law enforcement

11  officers investigating the case could have and should have used in lieu of a wiretap. For example,

12  Defendants suggest that law enforcement could have had one or more of its confidential informants do a

13  consensual recording with Defendants, or that it could have employed an undercover officer to do so.

14  With respect to Defendants' prostitution activities, they argue that law enforcement could have

15  interviewed sex trafficking victims and prostitutes known to be under the direction of various targets,

16  that they could have conducted additional surveillance on the identities and locations of prostitutes

17  working for Defendants, that they could have determined who was paying for prostitutes' rooms, or that

18  they could have arrested all of the prostitutes, seized their cell phones as evidence and obtained search

19  warrants to search their text messages, contacts, calendars, and other communications with pimps and

20  customers. Defendants also argue that law enforcement could have made their case by analyzing pen

21  register and toll analysis information, rather than taking the additional step of intercepting

22  communications. Other defendants also suggest that grand jury subpoenas, offers of immunity, review of

23  GPS tracking, surveillance camera footage could have and should have been used instead of wiretaps.

24          Law enforcement can demonstrate that the necessity requirement has been met by showing that

25  more traditional law enforcement procedures: 1) have been tried and failed, 2) appear reasonably

unlikely to succeed, or 3) are too dangerous to try. 18 U.S.C. § 2518(3)(c). As described above, the 16-001 Affidavit details extensive efforts by law enforcement to investigate members of the DPG over a period of several years. Additionally, the affiant explained why law enforcement had considered and rejected other potential investigative measures either because they concluded that the measures would be ineffective or too dangerous. For example, the affiants did not believe it was feasible to introduce an undercover officer to the group given that most of the DPG members and associates grew up together and would be naturally suspicious of an outsider. (16-001:169-75.) The affiants also noted that three of their four confidential informants were incarcerated at the time, and the fourth had cut off all contact with law enforcement. (16-001:170-73.) In any case, none of the confidential informants was willing to testify against DPG members for fear of retribution. (*Id.*) The affiant also described efforts to contact prostitutes working for DPG members, but noted that they had not been successful in getting them to cooperate and testify. (16-001:94, 201-202.) The affiant also expressed concern with using aggressive methods that might tip off Target Subjects to the investigation, causing them to change phone numbers and tactics to evade police scrutiny. (16-001:179, 200-02.) Likewise, the affiant discussed instances in which DPG had conducted counter-surveillance, revealing the likelihood that more aggressive surveillance methods would be ineffective, dangerous, or both. (16-001:148; 16-002:33-35 (gang members discussing "undercovers" following them on intercepted communication).)

With respect to the suggested use of pen registers, the affiant noted that the limitations of pen registers would not allow law enforcement to complete their investigation. (16-001:185-92); *see also Christie*, 825 F.3d at 1067 ("pen registers could not bring the investigation home because they could not disclose the content of the communications and, in most cases, failed to convey information about the parties to such communications").

In essence, the affiant indicated that he had considered all of the reasonable methods that Defendants suggested and either determined that they were futile, dangerous, or would not otherwise advance the goal of the investigation, which was dismantling the DPG organization. *See United States v.*

1   *Khan*, 993 F.2d 1368, 1375 (9th Cir. 1993) (finding the necessity requirement met by 42-page Affidavit

2   indicating that confidential informants were unwilling to testify against suspected conspirators, that

3   information could not be gained from drug couriers who did not know ultimate destination of the drugs,

4   and that normal surveillance techniques would be ineffective because suspected conspirators relied

5   heavily on the use of telephones); *Bennett*, 219 F.3d at 1121 (necessity requirement satisfied where

6   officials had tried to penetrate drug conspiracy using traditional methods, but were unable to obtain

7   information about extended organization); *Carneiro*, 861 F.2d at 1178 (fact that law enforcement agents

8   "could have taken different or some additional steps in its investigation does not demonstrate that the

9   district court abused its discretion in upholding the wiretap order"). The law does not require that law

10   enforcement exhaust every possible means of investigation before resorting to a wiretap. *Khan*, 993 F.2d

11   at 1375 ("law enforcement officials do not have to exhaust every investigative alternative before

12   obtaining a wiretap"). Nor does the law require law enforcement agents to be satisfied merely with

13   convicting a few lower level members of a gang simply because they can do so using less invasive

14   investigative measures. *Id.*

15       Moreover, many of the means that Defendants suggest law enforcement should have pursued

16   before applying for a wiretap would not advance the legitimate goals of their investigation. *United States*

17   *v. McGuire*, 307 F.3d 1192, 1197-98 (9th Cir. 2002). For example, the suggestion that law enforcement

18   simply round up every suspected prostitute or call witnesses before a grand jury would likely tip off the

19   organization to the size and scope of the investigation, and make it more difficult for law enforcement to

20   meet their goals. Similarly, while the government might have been able to prosecute certain members of

21   the organization for isolated crimes, they would not have been able to build a case against numerous

22   members of the criminal enterprise engaged in racketeering activity, and therefore would not have

23   furthered their goal of dismantling and debilitating the DPG. *Garcia-Villalba*, 585 F.3d at 1228 ("The

24   necessity for the wiretap is evaluated in light of the government's need not merely to collect some

25   evidence, but to develop an effective case against those involved in the conspiracy.") (citations omitted);

1   *see also United States v. Canales Gomez*, 358 F.3d 1221, 1224 (9th Cir. 2004) (affirming wiretap order

2   as necessary to identify the "full scope of the massive conspiracy under investigation" and to "obtain

3   direct evidence that will convince a jury beyond a reasonable doubt of its existence"); *Bennett*, 219 F.3d

4   at 1121 n.3 (wiretap was necessary to discover the "full scope" of the conspiracy).

5        The authorizing judge did not abuse his discretion in concluding that the wiretaps were necessary

6   to achieve the investigation's aims, and that law enforcement had sufficiently exhausted less intrusive

7   investigative means.

8        **3.**    ***Franks* Challenge**

9           **a.**     **Inclusion in DPG Injunction List**

10        Monson contends that the affiant misleadingly implies that Monson "is on the 2008 Court issued

11   'Dog Pound Gang Injunction List' which consists of approximately 120 DPG members." (ECF No. 345

12   at 35.) The 16-001 Affidavit indicates that Monson is "listed on a court ordered Dog Pound Gangsters

13   gang injunction list" and has been served with the injunction. (16-001:9, 16.) Monson contests his

14   inclusion on the gang injunction list as a factual matter. However, it seems that Monson and the

15   Government are talking about two different lists. Monson is on a list maintained by law enforcement and

16   titled "Dog Pound gang members subject to injunction" and both law enforcement records and the

17   docket in the civil suit indicate that he was served with a copy of the "gang injunction." (Monson Ex. 1,

18   ECF No. 347-1 at 14 (docket, *People v. Dog Pound Gangsters*, No. 07CECG03980); Monson Ex. 8,

19   ECF No. 347-8 at 2 (permanent injunction); ECF No 417-5 (law enforcement records).) However,

20   Monson is correct that he is not personally referenced in either the order granting the preliminary

21   injunction against the DPG, or the order granting a permanent injunction. (Monson Ex. 3, ECF No. 347-

22   4 at 2; Monson Ex. 8.) The phrase that someone is "on the gang injunction list" is a term commonly used

23   in state criminal proceedings and means that the person is a validated gang member or associate and has

24   been served with a copy of a civil gang injunction. (Declaration of Sr. Deputy DA Dennis Lewis, ECF

25   No. 417-7.) The docket indicates that Monson was served with a copy of the permanent injunction

1   issued by the state court. (Monson Ex. 1.) The affiant did not make a misleading or inaccurate statement

2   when he indicated that Monson was listed on a court ordered injunction.

3       **b.** **Self-identified DPG Membership**

4       The Government concedes that the affiant incorrectly indicated that Monson self-identified as a

5   DPG gang member during booking at Fresno County Jail on March 14, 2014. (Declaration of Sgt. Andre

6   Benson, ECF No. 417-10.) The affiant attempted to ascertain the source of the information, but could

7   not. *Id*. He also stated that he could not figure out how he made the mistake. *Id*. During that booking,

8   Monson classified himself as an associate of Murder Squad, a "clique of individuals from criminal street

9   gangs under the 'MUG' umbrella." *Id*. The DPG also falls under the MUG umbrella. *Id*. Even if the

10  misstatement was arguably reckless, it was not material and therefore does not warrant a *Franks* hearing.

11  There was probable cause to believe that Monson at least associated with DPG members without the

12  misleading statement based on the injunction and other evidence provided in the Affidavit. There was

13  also probable cause to intercept his communications based on the evidence of human trafficking. The

14  evidence that Monson self-identified as a DPG member was not required for a finding of probable cause.

15  *Bennett*, 219 F.3d at 1124-25.

16      Monson also argues that the 16-001 Affidavit incorrectly stated that Monson identified himself

17  as a DPG member in a recorded jail call with Northside Pleasant St. Gang member Keishma Daniels.

18  (16-001:88.) During the call, Monson berates Daniels for talking badly about DPG or "Pound"

19  members. The transcript of the call, read in context, tends to support the inference that that Monson is

20  referring to himself as part of the DPG or "Pound" group. (ECF No. 417-1.) The statement was not

21  misleading.

22      **c.** **Undisclosed Investigative Techniques**

23      Defendants contend that affiants concealed certain investigative tactics that were successful and

24  could have been used in this investigation. Although these arguments also go to whether the affiant

25  provided a "full and complete statement" pertaining to necessity, Defendants framed these arguments in

1   terms of a *Franks* challenge and the Court will address them as such, bearing in mind that whether the

2   affidavit contains a full and complete statement of investigative techniques is subject to *de novo* review.

3          Defendants contend that the 16-001 Affidavit omitted that a September 24, 2011 search warrant

4   had been executed on the residence of Natasha Parks and Kevin Wharry, and had revealed substantial

5   evidence of credit card fraud and identity theft. (ECF No. 311 at 24-25.) However, contrary to

6   Defendants contentions, the affiant did explain that investigators had used search warrants, probation

7   searches, and parole searches to combat criminal activity of the DPG for several years. (16-001:197.)

8   Moreover, the Affidavit does describe, in great detail, evidence of credit card fraud and identity theft

9   that was discovered through trash pulls at Kenneth Wharry and Natasha Parks' residence. (16-001:97-

10  138.) Additional evidence of investigative techniques used to discover similar evidence would have been

11  cumulative, and not material to the issuing court's consideration. The Affidavit's omission of evidence

12  discovered during a search warrant executed five years prior did not render it incomplete or misleading.

13         The Affidavit also indicates that, while trash pulls at certain residences uncovered evidence of

14  credit card fraud and identity theft, the evidence uncovered was not enough to successfully prosecute

15  Wharry and Parks. However, Defendants contend that the affiant concealed that he was also aware of

16  video evidence of DPG member Kenneth Johnson using a fraudulent credit card at a hotel which,

17  combined with the trash pulls, could have led to successful prosecution without the need to resort to

18  wiretaps. The affiant did not mention the video in the 16-001 Affidavit. However, Defendants have not

19  made a substantial (or any) showing that the omission was made recklessly or intentionally, or that it

20  was material. Even if the video and the trash pull could have led to the successful prosecution of

21  Kenneth Johnson for credit card fraud, it would not have satisfied the investigative goals of dismantling

22  the DPG. Therefore, the omission was not material because it would not have changed the issuing

23  judge's calculus as to the necessity of the wiretap. *See United States v. Shryock*, 342 F.3d 948, 977 (9th

24  Cir. 2003).

25         Defendants also contend that the affiant concealed that certain Defendants' cell phones had been

seized and searched pursuant to a search warrant or under conditions of probation. The affiant does

explain the benefits of intercepting calls and text messages on a real-time basis, as it allows law

enforcement offers understand observations from surveillance, meetings, and other evidence obtained

from various investigative techniques in context. (16-001:177-78.) The affiant also describes his concern

that DPG members often get rid of their phones or change their numbers after law enforcement serve

search warrants on gang members. (16-001:197.) Defendants do not make a "substantial showing that

the government had made intentional or reckless misrepresentations or omissions in the Affidavit."

*Shryock*, 342 F.3d at 977. Even if they had, it is not plausible that law enforcement could have met its

goal of dismantling the DPG through conducting cell phone searches on probationers and parolees

alone. *Id.* (*Franks* hearing not warranted because even if affiant made misleading statements or

omissions about additional steps that could have been taken, those statements were not "necessary to the

district court's finding of necessity"); *see also Rodriguez*, 851 F.3d 931, 941 (9th Cir. 2017) (where

affiant had plausibly explained why search warrants were unlikely to lead to successful prosecution, "the

omission of the search waiver from the statement of facts does not tip the balance and lead to a

conclusion that the affidavits did not include a full and complete statement of facts under.").

### d.   Monson's Involvement in the 2014 Homicide

Monson argues that the affiant made material omissions and misstatements about Monson's

involvement in the 2014 murder described in the 16-001 Affidavit. As an initial matter, the Court notes

that the affiant advised the issuing judge truthfully that Monson was not held to answer for the murder

because the presiding judge felt that there was not enough evidence to proceed. (16-001:146-150.) The

affiant described the factual basis for his belief that Monson was involved in the murder, and the issuing

judge was free to determine whether those facts supported a finding of probable cause as to Monson's

involvement in the murder. The statements were not misleading. Moreover, since this Court did not rely

on the evidence of the 2014 murder in concluding that the Affidavit contained probable cause to

intercept Monson's communications, any alleged misstatement or omission with respect to that incident

1   cannot form the basis of a request for a *Franks* hearing. *Ippolito*, 774 F.2d at 1485 (immaterial

2   misstatements or omissions do not trigger a *Franks* hearing). The fact that the affiant provided a detailed

3   factual basis for his beliefs allowed the issuing judge and this Court to make an independent judgment;

4   no *Franks* hearing is either required or is justified.

5              **e.    Omission of Appellate Court Reversal Based on Sgt. Benson's Vouching**

6          Monson argues that the 16-001 Affidavit was misleading because it relied on Sergeant Benson's

7   credibility even though an appellate court reversed a ruling based on his vouching for another witness's

8   credibility. This argument is meritless. The appellate court did not make any ruling bearing on Benson's

9   credibility. It simply held, as an evidentiary matter, that it was error for the trial court to allow Benson to

10  vouch for another witnesses' credibility. The purported omission was not even relevant, let alone

11  material.

12  **B.    Wiretap 16-002**

13         On February 22, 2016, Judge Harlan approved Wiretap 16-002, which authorized the

14  interception of two additional telephones, one belonging to Defendant Trenell Monson, and one to La

15  France Brown. (16-002.) The 54-page Affidavit, which also incorporates the 16-001 Affidavit, executed

16  just a week before, by reference, describes in detail the probable cause for intercepting the target

17  telephones and necessity of this spin-off wiretap. The affiant was California Highway Patrol ("CHP")

18  officer Michael Szatmari.

19         **1.    Probable Cause**

20              **a.    La France Brown, TT#8**

21         Monson challenges the 16-002 Affidavit for lack of probable cause with respect to the

22  interception of non-defendant La France Brown's communications (TT#8).[6] The Affidavit describes

23

24  _____

25  [6] To the extent that Monson challenges the interception of his communications under Wiretap 16-002 for lack of probable cause, that argument fails. As the Court explained with respect to Wiretap 16-001, the 16-001 Affidavit established sufficient probable cause to intercept Monson's communications. Therefore, the interception of his communications on a different cell

1   Brown as a validated DPG member. (16-002:19.) Evidence obtained in the first wiretap indicated that La

2   France Brown was involved in human trafficking and potentially in other gang activity, which he

3   discussed with Kenneth Johnson on an intercepted line using TT#8. For example, Brown discussed

4   pimping with Johnson on February 18, 2016, indicating that he wanted to move his "girl" to a different

5   spot and asking Johnson where other DPG members were pimping their prostitutes. (16-002:25.)

6   Therefore, there was substantial evidence that Brown was reasonably likely to be involved in criminal

7   activity associated with the DPG and that he was likely to discuss it on TT#8. There is no basis for

8   suppressing Wiretap 16-002.

9           **2.      <u>Necessity</u>**

10          Monson challenges whether the interception of La France Brown's phone was necessary. Many

11  of the arguments raised with regard to whether Wiretap 16-002 was necessary are substantially similar

12  to the arguments Monson raised with respect to Wiretap 16-001. As mentioned, each wiretap application

13  discussed herein incorporated by reference the affidavits contained in the prior wiretap application. The

14  Court therefore incorporates by reference its analysis of the necessity of Wiretap 16-001. Monson does

15  not appear to challenge that the 16-002 Affidavit provided a "full and complete statement" of

16  investigative procedures, but instead challenges whether the issuing court abused its discretion in

17  concluding that the necessity requirement was met.

18          Additionally, Monson argues that law enforcement officers never conducted any surveillance on

19  Brown before requesting authorization to intercept his communications and therefore that they hadn't

20  exhausted the traditional investigative techniques required to show necessity. This is incorrect. The 16-

21  002 Affidavit details surveillance conducted on Brown. (16-002:24-25.) Moreover, for reasons

22  explained in detail in the 16-001 Affidavit, sworn only seven days before, surveillance alone was not

23  likely to allow law enforcement officers to achieve their aim of dismantling the DPG organization. As

24  _____

25  phone, which he was known to be using, authorized just seven days later was also supported by the same substantial
    evidence.

1   the 16-001 Affidavit averred, and the 16-002 Affidavit confirmed, DPG members were particularly

2   surveillance-conscious. Indeed, Tremayne Beard and Steven Blackmon each separately discussed being

3   followed by "undercovers" during communications intercepted as a result of Wiretap 16-001. (16-

4   002:33-35.) The Court did not abuse its discretion in determining that the application for interception of

5   La France Brown's phone met the necessity requirement.

6        **3.**     *Franks* **Challenge**

7            **a.**     **Undisclosed Evidence that La France Brown Was Unlikely to Use His Cell**
                **Phone to Discuss Criminal Activity**

8

9         In a call intercepted pursuant to Wiretap 16-001, La France Brown's stated that people "talk too

10   much." In a report describing the call, Special Agent Pacheco of the California Department of Justice

11   opined, based on his training and knowledge of the case, that "most people involved in criminal activity

12   will elect to speak in person about conversation that they feel could be heard over the phone by law

13   enforcement."

14         Multiple defendants argue that La France Brown's statement and Special Agent Pacheco's

15   interpretation of it contradicts the affiants' conclusions that criminal conversations will be intercepted

16   via a wiretap. However, Brown's statement, and SA Pacheco's commentary on it, do not negate

17   probable cause. Law enforcement could credibly believe both that the Target Subjects would be

18   reluctant or cautious in using their cellular phones to discuss criminal activity, yet simultaneously and

19   reasonably believe they would eventually discuss information that would advance the goals of the

20   investigation. *See Meling*, 47 F.3d at 1552 (discussing that fact that individuals who suspect that they are

21   under surveillance might still "get careless and utter incriminating statements"). The statement offered

22   by the affiant that people engaged in criminal activity used cellular phone was not incorrect, reckless, or

23   misleading.

**C.**     **Wiretap 16-003**

24         On February 24, 2016, Judge Harlan approved Wiretap 16-003, which authorized the

25

1   interception of four additional telephones associated with DPG members Darrell Maxey (using TT#9),

2   Rayquan Brown, Kiandre Johnson (using TT#11), and Kenneth Wharry (using TT#12). (16-003.) The

3   69-page Affidavit, which also incorporates the 16-001 and 16-002 Affidavits by reference, describes in

4   detail the probable cause and necessity for intercepting the additional telephones. The affiant was CHP

5   officer Michael Szatmari.

6   **1.**     **Probable Cause**

7   **a.**     **Kenneth Wharry**

8   Defendants argue that the 16-003 Affidavit lacked probable cause as to Kenneth Wharry. The

9   Affidavit details Wharry's membership in the DPG and his previous involvement in criminal activity,

10  including credit card fraud and carrying a loaded firearm. (16-003:15-16.) The Affidavit also details an

11  intercepted conversation between Kenneth Johnson and Kenneth Wharry in which Wharry discussed

12  having a "17" – believed to refer to a Glock 17 handgun. (16-003:32-33.) Wharry was also intercepted

13  discussing prostitution with other known DPG members. (16-003:37-39.) Moreover, the 16-003

14  Affidavit incorporated by reference the 16-001 Affidavit, which discussed Wharry's involvement in

15  financial fraud in 2015. (16-001:97-98, 119, 129-30, 137-38, 165.) The 16-001 Affidavit presents

16  significant evidence that Wharry was involved in credit card fraud and identity theft, based on trash

17  pulls at his residence where fraudulent credit cards and tax return were located and a traffic stop where

18  he was found in possession of multiple bank cards, at least one of which was determined to be stolen,

19  among other evidence. (*Id.*) The interceptions obtained through Wiretaps 16-001 and 16-002 also

20  indicate that Wharry was discussing potentially illegal and criminal activity on TT#11. The authorizing

21  judge's determination that there was probable cause to intercept Wharry's communications was

22  supported by substantial evidence in the 16-001 and 16-003 Affidavits.

23  **b.**     **Defendant Maxey**

24  Defendant Maxey argues that there was not sufficient probable cause to intercept his

25  second/changed cell phone number: TT#9. (ECF No. 354 at 23.) First, as the Court explained above,

1   Wiretap 16-001, issued just nine days before, provided probable cause to believe that Maxey was

2   involved in human trafficking and witness intimidation, at a minimum. The order authorizing

3   interception of his communications on TT#5 was approved on that basis. Second, according to the 16-

4   003 Affidavit, Maxey posted on Facebook that he had changed his cell phone number to TT#9 and he

5   was observed answering TT#9 by law enforcement agents shortly thereafter.[7] (16-003: 25-26.)

6   Therefore, there was probable cause to believe that Maxey would use his new cell phone number, TT#9,

7   to discuss specified criminal activity.

8           **c.**      **Kiandre Johnson**

9          Defendant Kiandre Johnson argues that there was not sufficient probable cause to intercept his

10  cell phone: TT#11. (ECF No. 363 at 10-11.) The 16-003 Affidavit primarily describes two

11  communications between Kiandre Johnson and other DPG members and associates that support the

12  position that Kiandre Johnson was involved in human trafficking. The first communications was a call

13  between Wharry/Kiandre Johnson (using TT#11) and Millro (using TT#6). Millro and Wharry discuss

14  pimping and Wharry's Glock 17. At one point, Kiandre Johnson jumps in to discuss spending the night

15  before with a woman. Defendant argues that he was not discussing prostitution activities during this call

16  and it does not support the proposition that he was involved in prostitution and human trafficking. While

17  the call, standing alone, might not establish Kiandre Johnson's involvement, a subsequent text message

18  chain between Kiandre Johnson and Kenneth Johnson confirms his involvement with human trafficking.

19  As noted, the Court looks to the totality of evidence presented in determining probable cause. *Stevens*,

20  800 F. Supp. at 904 (D. Haw. 1992) (defendant's "attempt to attack each individual piece of evidence as

21  insufficient to support a finding of probable cause ignores the Supreme Court's mandate to consider all

22  the evidence as a whole in a practical manner"). In the text message exchange, Kenneth Johnson gives

23

24  ───────────────

25  [7] The affiant explains that it appears that Maxey changed his cell phone number while 16-001 was in the review process. (16-003: 25.) The affiant explains in the 16-003 affidavit that law enforcement never observed any incoming or outgoing phone calls on TT#5 during the period that the electronic intercept was active. (*Id.*)

1    Kiandre Johnson specific advice on how to obtain money from a prostitute working for him. (16-003:

2    35-36.) This evidence, combined with the fact that Kiandre Johnson is a self-admitted DPG associate,

3    support the probable cause determination by the issuing judge.

4          Kiandre Johnson also argues that the Affidavit does not contain probable cause as to him because

5    it erroneously indicates that he is a self-identified *member* of DPG. He contends that the probable cause

6    is based on reckless or intentional material misstatements and omissions, and therefore that he is entitled

7    to a *Franks* hearing. The Court will discuss these issues under the *Franks* framework. *See infra* at 33-34.

8          **2.    Necessity**

9          Defendants Monson, Maxey, Kiandre Johnson, and Wharry challenge the necessity of Wiretap

10   16-003. Many of the arguments raised with regard to whether Wiretap 16-003 was necessary are

11   substantially similar to the arguments that Defendants raised with respect to Wiretaps 16-001 and 16-

12   002. The Court therefore incorporates by reference its analysis of the necessity of Wiretap 16-001 and

13   Wiretap 16-002. Defendants do not appear to challenge that the 16-003 Affidavit provided a "full and

14   complete statement" of investigative procedures, but instead challenges whether the issuing court abused

15   its discretion in concluding that the necessity requirement was met.

16         Defendants argue that the 16-003 Affidavit fails to add any new information relating to the use of

17   undercover agents and confidential sources (ECF No. 346 at 56-57.) However, the initial Affidavit,

18   authored only a week before, explained in detail why the use of undercovers and confidential informants

19   either was not feasible or was too dangerous. (16-001:168-75; 16-003:43-49.) Since there is no reason to

20   believe that law enforcement's analysis with respect to confidential informants or undercover officers

21   changed in the interim period, the failure to supplement the information contained in the Affidavit

22   during the seven day period was not in error. *Rodriguez*, 851 F.3d at 942 (acknowledging risks of using

23   undercover agents, confidential sources, interviews, and grand jury subpoenas in investigation of "close-

24   knit group with a known violent propensity").

25         Defendants also argue that agents could have conducted surveillance on suspected prostitutes

1 | through the use of backpage.com, and could have located them and interviewed them in a reverse sting
2 | operation. However, the Affidavit indicates that while officers have been "moderately successful in
3 | contacting prostitutes and victims of human trafficking," the victims are often unwilling to provide
4 | information or testify. (16-003:62-63.) The affiant's judgment that additional sting operations or
5 | interviews would not lead to successful prosecution is not unreasonable. *Carneiro*, 861 F.2d at 1178
6 | (fact that law enforcement agents "could have taken different or some additional steps in its
7 | investigation does not demonstrate that the district court abused its discretion in upholding the wiretap
8 | order").

9       Defendant Kiandre Johnson suggests that officers could have conducted additional surveillance,
10 | used pole cameras at prostitution locations, conducted trash searches, or conducted an investigation of
11 | his finances. (ECF No. 363 at 15-17.) The 16-003 Affidavit indicates that law enforcement officers did
12 | conduct surveillance on him. (16-003:27, 34.) The Affidavit indicates that surveillance cameras are
13 | limited in their utility, and in any case the Affidavit indicates that DPG members used a wide range of
14 | hotels and motels throughout the Central Valley for prostitution. (16-003:57-58.) Extensive surveillance
15 | camera use would have been required, and might not have yielded much useful information. With
16 | respect to trash pulls, agents had not been able to confirm the residences of Maxey and Johnson.
17 | (Declaration of Daniel Sanchez, ECF No. 417-8.) However, their addresses of record were apartment
18 | complexes that use community dumpsters to dispose of trash, which would prohibit law enforcement
19 | officers from being able to identify trash disposed of by the Target Subjects. (16-003:57.)

20       Defendants suggest that agents had probable cause to arrest Defendant Wharry for illegal
21 | possession of a firearm on the basis of the intercepted call described in the 16-003 Affidavit, during
22 | which Wharry indicates that he always carries a firearm. First, it is questionable whether the wiretap
23 | provided sufficiently clear information regarding the location of Wharry or his firearm such that a
24 | warrant could be obtained and executed successfully. Second, arresting Wharry for illegal possession of
25 | a firearm at that stage could have compromised the rest of the investigation and would not necessarily

have facilitated the agents' ultimate goal of dismantling the DPG. *Canales Gomez*, 358 F.3d at 1224

(affirming wiretap order as necessary to identify the "full scope of the massive conspiracy under

investigation" and to "obtain direct evidence that will convince a jury beyond a reasonable doubt of its

existence"); *see also Garcia-Villalba*, 585 F.3d at 1228 (noting that the government is entitled to amass

evidence to develop an "effective case").

In short, Defendants suggest several alternative ways that law enforcement could have conducted

the investigation. However, these arguments are not sufficient to show that the issuing judge abused his

discretion in concluding that the wiretap was necessary. The affiant's thorough account of all of the

investigation techniques either attempted or considered in good faith and rejected was sufficient. The

issuing judge did not abuse his discretion by determining that Wiretap 16-003 met the necessity

requirement. *Carneiro*, 861 F.2d at 1178 (defendants suggestion of alternative investigation methods

"with the benefit of hindsight" was not sufficient to demonstrate that wiretap was not legally necessary).

### 3.   ***Franks* Challenge**

#### a.    **Defendant Maxey's *Franks* Challenge**

Defendant Maxey argues that he is entitled to a *Franks* hearing regarding to "misrepresentations

and omissions" made in the 16-003 Affidavit. (ECF No. 354 at 24.) Maxey generally argues that "the

same concealment of other investigation techniques, and material misrepresentation of the success of

such techniques, if employed, apply to wiretap 16-003 as apply to the original wiretap, 16-001." (*Id.*)

This Court therefore refers to its discussion of the *Franks* challenge to Wiretap 16-001. Maxey

otherwise failed to provide a detailed offer of proof that the 16-003 Affidavit contained a deliberate or

reckless false statement or omission. *United States v. Perdomo*, 800 F.2d 916, 921 (9th Cir. 1985). The

request is denied.

#### b.    **Defendant Kiandre Johnson's *Franks* Challenges**

Kiandre Johnson alleges that the affiant made the following material misrepresentations: (1) that

he was a "self-admitted Dog Pound Gangster," (2) that he was being subject to the DPG gang injunction;

(3) that agents did not know his address and could not conduct surveillance of him, and (4) that he was involved in prostitution activities. The Court addressed the fact that the 16-003 Affidavit contained probable cause of Kiandre Johnson's prostitution activities. Therefore, a *Franks* hearing is not warranted on that contention.

### (1)    Gang Membership

Kiandre Johnson maintains that he self-identified consistently as a DPG associate, not a member, contrary to the affiant's representation in the 16-003 Affidavit. (16-003:22-23.) He offers the opinion of retired FPD officer Ramon Gines that Johnson is an associate and not a member. Defendant has not made a substantial showing that the affiant misstated Kiandre Johnson's association deliberately or recklessly, as is required to show that a *Franks* hearing is warranted. Moreover, whether Johnson was a DPG member or a DPG associate is not material. (*See* Szatmari Decl. ¶ 4 (noting that the difference between a gang associate and a gang member can be minimal).) There was probable cause to intercept Johnson's communications without his official affiliation status based on communications intercepted between him and other DPG members, as well as other factors described above. A *Franks* hearing is not warranted.

Kiandre Johnson also challenges the affiant's statement that he was included on the gang injunction list. The Court refers to its discussion of Monson's challenge to the gang injunction. *Supra* at 22. The docket in *People v. Dog Pound Gang*, No. 07CECG03980, likewise reflects that Kiandre Johnson was served with a copy of the gang injunction. (Monson Ex. 1 at 14.)

### (2)    Address

Defendant Johnson challenges the affiant's contention that law enforcement could not conduct surveillance on him because they did not know where he resided. Defendant contends that this statement was false and misleading because Defendant was on probation and law enforcement was aware of his address of record. Contrary to Defendant's contention, the affiant does discuss Kiandre Johnson's address of record. (16-003:57.) However, law enforcement officers could not confirm whether this was

1   Kiandre Johnson's actual place of residence. Moreover, as previously explained, the ability to conduct

2   search warrants and surveillance would not have obviated the need for a wiretap order under the

3   circumstances of this investigation. *See Bennett*, 219 F.3d at 1121 n.3 (wiretap needed to discover "full

4   scope" of conspiracy).

5   **D.   Wiretap 16-004**

6   　　　No party has explicitly moved to suppress Wiretap16-004. To the extent the parties contend that

7   16-004 is fruit of the poisonous tree because the Affidavit incorporates previous wiretap applications by

8   reference, that argument is without merit for the reasons explained above.

9   **E.   Wiretap 16-005**

10   　　　On March 2, 2016, Judge Harrell issued an order authorizing the interception of three additional

11   telephone numbers, one targeting Defendant Davon Millro (TT#16) and two targeting Defendant James

12   York (TT#14, TT#15). The 73-page Affidavit, which also incorporates all previous affidavits by

13   reference, describes in detail the probable cause and necessity for intercepting the additional telephones.

14   The affiant was CHP officer Michael Szatmari.

15   　　　**1.   Probable Cause**

16   　　　　　**a.   James York**

17   　　　Neither York nor any other Defendant appears to argue that the 16-005 Affidavit did not

18   establish probable cause to target York's two cell phone numbers. However, in an abundance of caution,

19   the Court notes that there was substantial evidence of probable cause presented in the Affidavit.

20   　　　The affiant describes observing York using TT#14 and TT#15, and explains that law

21   enforcement intercepted phone calls on both phones in which York and other DPG members discussed

22   internal gang issues, including a feud between DPG members where there had been threats of violence

23   on both sides. (16-005:31-36.) During one call, York and Maxey were discussing a rift between the

24   older members of DPG, including Tremayne Beard and Corey McDonald, and the younger members,

25   including Maxey and Davon Millro. (16-005:35.) York indicated to Maxey that Millro should not have

1   posted about the fight on Facebook. (*Id.*) Millro apparently indicated on Facebook that he believed that

2   Beard and McDonald were talking to law enforcement. (*Id.*) York told Maxey that if people were talking

3   to law enforcement, he would assault or shoot them. (16-005:36.) Moreover, the nature of the calls led

4   agents to believe that York was a senior member and leader in DPG, as he was being called on to

5   mediate intra-gang conflict.

6       York was also heard discussing pimping and prostitution activities on an intercepted call with

7   Kiandre Johnson. (16-005:38.) During the call, York indicated that he had just acquired a new prostitute

8   to work for him. (*Id.*) Based on the intercepted communications on both TT#14 and TT#15, there was a

9   substantial basis to believe that York would use those two phones to discuss criminal activity.

10              **b.    Davon Millro**

11      Defendant Millro challenges the allegations offered in the Affidavit on the grounds that they only

12  offer evidence that he was a member of DPG and don't indicate that he was personally engaged in

13  criminal activity. (ECF No. 323 at 8-14.)

14      The 16-003 Affidavit, which was incorporated in the 16-005 Affidavit by reference, describes an

15  intercepted phone call between Wharry and Millro. During the call, the two discuss prostitution and

16  pimping. Millro indicated that he was making significant money from pimping and that he was planning

17  to go to "E-1-4" in the "bay", which officers interpreted as a reference to East 14th Street in Oakland, an

18  area well known for prostitution. (16-003:32-34.) Later communications between other gang members

19  indicated that Millro had "knocked" a new prostitute named "Tessa", and surveillance observed Millro

20  and a known prostitute named Natessa Winston together in Fresno. (16:003:40.) In another intercepted

21  call, Millro and Kenneth Johnson discussed prostitution and pimping of a prostitute in Bakersfield. (16-

22  00543-44.) Millro was also observed, along with Maxey, picking up several women known to be

23  prostitutes from a motel in Merced. (16-005:44.) Additionally, Millro discussed internal gang issues

24  with other DPG members, and at one point indicated that he was in possession of "things" which the

25  agent believed to mean that he was in possession of guns. (16-005:42.)

The above assertions, as well as other evidence in the affidavits, indicate that Millro was using TT#16 to discuss criminal activity with other DPG members, and those communications were intercepted pursuant to prior wiretap orders. The Court has no trouble concluding that the authorizing judge's determination that there was probable cause to intercept Millro's communications was based on substantial evidence of his involvement in human trafficking and gang violence. The probable cause against Millro was not solely, or even primarily, based on his gang affiliation, as Defendant suggests.

## 2. __Necessity__

Defendants Millro and York challenge the necessity of Wiretap 16-005. Many of the arguments raised with regard to whether the 16-005 Affidavit was necessary are substantially similar to the arguments that Defendants raised with respect to Wiretaps 16-001, 16-002, and 16-003. The Court therefore incorporates by reference its analysis of the necessity of previous wiretaps. Defendants do not appear to challenge that the 16-005 Affidavit provided a "full and complete statement" of investigative procedures, but instead challenge whether the issuing court abused its discretion in concluding that the necessity requirement was met.[8]

Millro challenges the thoroughness of the issuing judge's review of each affidavit based on the time stamps indicating that the affidavits were sworn and subsequently approved by the court within minutes of each other. Defendant's argument is based on speculation and suppositions. The Court is not going to join defense counsel on that road. There is no basis to believe that the issuing judge was not thoroughly familiar with all relevant and incorporated material prior to issuing each order.

Millro and York also argue that investigating officers did not exhaust investigative methods before applying for Wiretap 16-005. (ECF No. 323 at 14-34; ECF No. 331 at 12-17.) Defendants suggests that agents should have used undercover agents, confidential informants, surveillance, interviews with human trafficking victims, pen registers and toll analysis, trash searches, and search

---

[8] Millro and York challenge the incorporation of prior affidavits by reference. The Court discusses this challenge below. *See infra* at 49-50.

warrants. The 16-005 Affidavit and prior affidavits incorporated by reference, explicitly addressed the

extent to which these methods were used in this investigation, or why they were not attempted. For

example, the 16-005 Affidavit, as well as the 16-003 Affidavit which is incorporated by reference,

outlined several surveillance operations involving Millro (16-003:34, 40; 16-005:44-45, 53-55) and

York (16-005:31-32.) The affiant averred that surveillance alone would not be sufficient to build a case

against Millro and other DPG members. With respect to York's contention that trash searches should

have been conducted, the affiant averred that he did not yet know where York and Millro were residing

in Fresno. (16-005:61.) Defendants other contentions have been addressed above in connection with

prior wiretap orders and are without merit. Defendants fail to demonstrate that the issuing judge abused

his discretion in finding that Wiretap 16-005 was necessary. *See Bennett*, 219 F.3d at 1121 n.3 (wiretap

needed to discover "full scope" of conspiracy).

### 3. *Franks* Challenge

#### a. Davon Millro's *Franks* Challenges

##### (1) Incorrect Alias

Davon Millro challenges the 16-005 Affidavit on the grounds that it incorrectly referred to

Teantre Millro as an alias of Davon Millro when, in fact, Teantre Millro is Davon Millro's brother. (ECF

No. 323 at 37-38.) The 16-005 Affidavit lists "Teantre Millro, date of birth 03/25/95" next to the word

"Alias" in its description of Target Subject Davon Millro. (16-005:10-11.) The Affidavit does not refer

to Teantre Millro anywhere else, nor does it attribute any communications or actions by Teantre Millro

to Davon Millro. Assuming Defendant is correct that Teantre Millro is Defendant Davon Millro's

brother, and not his alias, there is not a scintilla of evidence that the affiant misstated Davon Millro's

alias intentionally or recklessly. More importantly, there is no inference that the potential

misidentification of Millro's brother as his alias had any bearing on the issuing judge's determination of

probable cause or necessity. Since the alleged misrepresentation was not material, there is no basis for a

*Franks* hearing. *Shryock*, 342 F.3d at 977.

1

**(2)     Failure to Disclosure September 2015 Arrest and Search**

2          Millro requests a *Franks* hearing on the grounds that the affiant failed to disclose to the judge

3   that Millro had been arrested, and his residence searched, in September of 2015. (ECF No. 323 at 30-

4   32.) However, although the specific search of Millro's residence and his arrest were not discussed, the

5   affiant did explain generally that investigators used search warrants, probation searches and parole

6   searches to combat criminal activity of DPG for several years. (16-005 62-63.) Indeed, the affiant

7   explained that search warrants could be helpful in collecting evidence, and that he believed that search

8   warrants could be secured and served at Millro's residence. (*Id.*) Critically, however, he indicated that

9   while such a search, "might lead to arrests and the seizure of controlled substance or illegal firearm, . . .

10  it would not likely assist law enforcement in solving any homicides or assaults with deadly weapons,

11  and it would not assist investigators in identifying potential victims of human trafficking." (16-005:63.)

12  In other words, although a search might have given officers probable cause to arrest Millro, it would not

13  serve the overall goals of the investigation. *McGuire*, 307 F.3d at 1197-98 ("the government is entitled

14  to more leeway in its investigative methods when it pursues a conspiracy").

15  **F.     Wiretap 16-007.1**

16         No party has explicitly moved to suppress Wiretap16-007.1. To the extent the parties contend

17  that Wiretap 16-007.1 is fruit of the poisonous tree because the Affidavit incorporates by reference

18  previous wiretap applications that Defendants believe are invalid, that argument is without merit for the

19  reasons explained above.[9]

20  **G.     Wiretap 16-009**

21         No party has explicitly moved to suppress Wiretap16-009. To the extent that the parties contend

22  that Wiretap 16-009 must be suppressed as fruit of the poisonous tree because the Affidavit incorporates

23  previous wiretap applications that Defendants believe are invalid by reference, that argument is without

24

25  _____

[9] Monson joins Parks' challenge to 16-007.1. However, Parks simply joined other defendants' motions and did not
specifically argue that 16-007.1 should be suppressed.

1    merit for the reasons explained above.

2    **H.    Wiretap 16-010**

3         On March 30, 2016, Judge Harrell issued an order authorizing Wiretap 16-001, an extension of

4    Wiretap 16-003, on TT#9 (belonging to Darrell Maxey), TT#11 (belonging to Kiandre Johnson), and

5    TT#12 (belonging to Kenneth Wharry). The 107-page Affidavit, which also incorporates all previous

6    affidavits by reference, describes in detail the probable cause and necessity for extending the

7    interception of communications on the target telephones. The affiant was CHP officer Michael Szatmari.

8         **1.    Probable Cause**

9              **a.    Darrell Maxey**

10        Defendant Maxey challenges the probable cause to continue to intercept his communications in

11   Wiretap 16-003. The Affidavit details an intercepted conversation between Maxey and an underage

12   prostitute working for DPG member Aquilla Bailey. (16-010:24-30.) The underage minor was looking

13   for Bailey and asked Maxey to facilitate getting them in touch. The nature of the call indicated that

14   Maxey was facilitating and assisting with Bailey's human trafficking of a minor. In addition to the

15   ample probable cause set forth in the 16-001 and 16-003 Affidavits, the evidence obtained since the

16   inception of those wiretaps is more than sufficient to show that Maxey continued to be involved in

17   criminal activity related to the DPG and that he continued to use TT#9 to discuss his criminal activity.

18        The affiant also describes a call in which Maxey discussed giving Kiandre Johnson a magazine

19   for a firearm after Kenneth Wharry was shot. The affiant infers based on the context of the conversation

20   that Maxey and Johnson were conspiring to acquire a firearm to shoot rival gang members in retaliation

21   for Wharry having been shot. (16-010:33-34.)

22        The 16-010 Affidavit sets forth substantial evidence that Maxey was involved in human

23   trafficking and violent crime, which he discussed on TT#9. The wiretap extension as to Maxey was not

24   improper.

25              **b.    Kiandre Johnson**

1        Kiandre Johnson argues that Wiretap 16-010 must be suppressed because it incorporates the 16-

2   003 Affidavit, which lacks probable cause to intercept his communications. As the Court explained, the

3   16-003 Affidavit was supported by probable cause. The 16-010 Affidavit detailed numerous

4   conversations that described potential criminal activity, including the conversation referenced above

5   between Kiandre Johnson and Maxey about acquiring firearms after Wharry's shooting. Therefore,

6   Wiretap 16-010 was supported by probable cause as to Kiandre Johnson.

7          **c.**      **<u>Kenneth Wharry</u>**

8        Wharry contends that 16-010 was not supported by probable cause. The 16-010 Affidavit

9   contains details of Wharry's shooting, describing many of the intercepted communications revolving

10  around his shooting and the aftermath. Wharry contends that he was the victim, and that the

11  conversations about the shooting do not show that he had committed, was committing, or was about to

12  commit a crime.

13       The 16-010 Affidavit outlined sufficient probable cause for the continued interception of TT#12.

14  The Affidavit describes numerous calls between Wharry (using TT#12) and other DPG members

15  discussing human trafficking, credit card fraud, and acquisition of a firearm for the purpose of

16  committing violent crime. (16-010:54-63.) For example, the Affidavit describes a lengthy telephone call

17  between James York and Kenneth Wharry in which the two discuss Wharry's credit card fraud activity.

18  (16-010: 54-55.) The Affidavit also discusses a call intercepted between Wharry and DPG member and

19  Defendant Deandre Stanfield. Stanfield told Wharry that he needed to organize the younger DPG

20  members to uphold the violent reputation of DPG. (16-101:60.) The context of the call also led the

21  affiant to believe that Stanfield, a high ranking member of the DPG, was giving direction to Wharry, a

22  younger member. (16-010:61.) The Affidavit also described numerous phone calls involving Wharry

23  about gathering firearms, although the participants used coded language (i.e. "thing," "tooly," and "long

24  one"). (16-010: 64-68.) Wharry also tells someone that it's time to "get at em" which, in context, the

25  officers understood to mean that Wharry was planning to violently assault someone. (16-010:66.)

1    Wharry contends that the coded language that the affiant alleges was used to describe firearms

2    could have meant anything, and is not a sufficient basis for probable cause. (ECF No. 368 at 13.)

3    However, read in context, the numerous intercepted conversations make clear that Wharry was

4    discussing firearms and gun violence. (16-010:57-70.) There was probable cause to continue

5    intercepting TT#12.

6    **2.    Necessity**

7    Defendants Maxey, Johnson, and Wharry challenge the necessity of Wiretap 16-010. Many of

8    the arguments raised with regard to whether 16-010 was necessary are substantially similar to the

9    arguments that Defendants raised with respect to previous wiretap orders. The Court therefore

10   incorporates by reference its analysis of the necessity of previous wiretaps. Defendants do not appear to

11   challenge that the 16-010 Affidavit provided a "full and complete statement" of investigative

12   procedures, but instead challenge whether the issuing court abused its discretion in concluding that the

13   necessity requirement was met.

14   In addition to arguments already considered and rejected with respect to prior wiretaps,

15   Defendants generally contend that there was no reasonable basis to extend Wiretap 16-003 to Wiretap

16   16-010 because the prior wiretap did not yield fruitful information concerning homicides committed by

17   the DPG. Defendants' contentions lack merit. The 16-010 Affidavit details investigative techniques that

18   were tried, along with the outcome of those methods. It details a number of interceptions that advanced

19   the investigation, including interceptions regarding acquiring firearms, planned violent crime, and

20   human trafficking. The Affidavit also details other investigative methods undertaken concurrently with

21   the wiretaps, including extensive surveillance conducted by law enforcement in response to Wharry's

22   March 23 shooting, efforts to locate an underage sex trafficking victim, as well as a number of other

23   actions taken to meet the goals of the investigation. (16-010:70-78, 86-88.) The affiant provided a

24   thorough discussion of the investigation, including the limitations of alternative investigative methods.

25   The issuing judge did not abuse his discretion in concluding that the necessity requirement was met.

1  *Rodriguez*, 851 F.3d at 938.

2  ### 3.  *Franks* Challenge

3  Maxey argues that he is entitled to a *Franks* hearing regarding to "misrepresentations and

4  omissions" made in the 16-010 Affidavit. (ECF No. 354 at 24.) Maxey generally argues that "the same

5  concealment of other investigation techniques, and material misrepresentation of the success of such

6  techniques, if employed, apply to wiretap 16-010 as apply to the original wiretap, 16-001." (*Id.*) This

7  Court therefore refers to its discussion of the *Franks* challenge to Wiretap 16-001. Maxey otherwise

8  failed to provide a detailed offer of proof that the 16-010 Affidavit contained a deliberate or reckless

9  false statement or omission. *Perdomo*, 800 F.2d at 921 (9th Cir. 1985).

10 ## I.  Wiretap 16-011

11 On April 1, 2016, Judge Harrell issued an order authorizing an extension of wiretap order 16-005

12 on TT#15 (belonging to James York) and TT#16 (belonging to Davon Millro). The 98-page Affidavit,

13 which also incorporates all previous affidavits by reference, describes in detail the probable cause and

14 necessity for extending the interception of communications on the target telephones. The affiant was

15 CHP officer Michael Szatmari.

16 ### 1.  Probable Cause

17 #### a.  Davon Millro

18 Defendant Millro argues that Wiretap 16-011 was not supported by probable cause because: (1)

19 it relied on the 16-005 Affidavit, which was not supported by probable cause, and (2) the

20 communications intercepted pursuant to Wiretap 16-005 did not support the conclusions drawn by the

21 affiant in 16-011. (ECF No. 323 at 34-36.) As an initial matter, the Court has explained that there was

22 probable cause to intercept Millro's communications initially, as laid out in the 16-005 Affidavit.

23 Moreover, the 16-011 Affidavit details a number of intercepted phone calls and text messages that show

24 Millro's extensive involvement in human trafficking and gang violence. For example, Millro exchanged

25 text messages with Trenell Monson, asking him to set up a Backpage.com add for one of the prostitutes

1    working for Millro. (16-011:51-52.)

2       Also, Millro was intercepted discussing obtaining firearms and planning a retaliatory shooting

3    after Wharry was shot on March 23. (16-011: 48-49, 55-61.) Millro contends that "agent Szatmari has

4    engaged in rank and unsupported speculation as to the supposed real meaning behind a few colloquial

5    phrases made by Millro." (ECF No. 323 at 35.) The Court disagrees. A holistic reading of the

6    communications described in the Affidavit leaves the Court with little doubt that Millro was discussing

7    firearms ("things") and retaliatory violence in the intercepted communications. (16-011:48-50, 56-61.)

8    The affiant explained the bases for his interpretation of coded language. The 16-011 Affidavit

9    adequately established a factual basis for the affiant's belief that Millro was a DPG member engaged in

10   criminal activity, including pimping/prostitution and violent crime. *Meling*, 47 F.3d at 1552 ("Looking

11   only to the four corners of the wiretap application, we will uphold the wiretap if there is a substantial

12   basis for these findings of probable cause") (internal citations omitted).

13        **2.    <u>Necessity</u>**

14       Defendants Millro and York challenge the necessity of Wiretap 16-011. Many of the arguments

15   raised with regard to whether the 16-011 Affidavit was necessary are substantially similar to the

16   arguments that Defendants raised with respect to previous wiretap orders. The Court therefore

17   incorporates by reference its analysis of the necessity of previous wiretaps. Defendants do not appear to

18   challenge that the 16-011 Affidavit provided a "full and complete statement" of investigative

19   procedures, but instead challenge whether the issuing court abused its discretion in concluding that the

20   necessity requirement was met.

21       Millro argues that Wiretap 16-011 was not necessary because Millro could have been arrested for

22   prostitution based on the previously intercepted communications. However, just because the government

23   has probable cause to arrest the target of a wiretap does not mean that the wiretap is no longer necessary.

24   *See Garcia-Villalba*, 585 F.3d at 1228 ("An 'effective case' means 'evidence of guilt beyond a

25   reasonable doubt, not merely evidence sufficient to secure an indictment.'") (citations omitted).

York argues that the evidence in support of necessity set forth in the 16-011 Affidavit is the same as the evidence set forth in the 16-005 Affidavit. However, the 16-011 Affidavit identified a new confidential source who had knowledge of Trenell Monson (16-011:74) and detailed surveillance operation of York that demonstrated that he was in contact with prostitutes under his control (16-011:79), toll analysis of York's phone (16-011:81-82), and identification of York's residence (16-011:86). The 16-011 Affidavit also outlined significant surveillance conducted on York, including surveillance of a weapons transaction. (16-011:30-32.) The affiant established that that law enforcement agents were actively pursuing several investigative methods with respect to York, and were not relying solely on the wiretap. The affiant also credibly averred that interception of York's phone was still necessary to achieve the goals of the investigation. (16-011:82 ("the contents of the conversation are necessary if agents are to know when to conduct surveillance or learn the dates and times of criminal activity").) The authorizing judge did not abuse his discretion in concluding that the 16-011 Affidavit satisfied the necessity requirement.

### 3.   *Franks* Challenge

Millro reiterates the same *Franks* challenges to Wiretap 16-011 as he did to Wiretap 16-005. The Court incorporates by reference its discussion of Wiretap 16-005. Defendants have not established that any material misstatements or omissions in the 16-005 Affidavit warrant a *Franks* hearing.

## J.   Wiretap 16-012

On April 15, 2016, Judge Harrell issued an order authorizing a wiretap on TT#20 (belonging to Trenell Monson), TT#21 and TT#22 (belonging to Markeith Canady), TT#23 (belonging to Kenneth Wharry), and TT#24 (belonging to Kitteran Patton). The 105-page Affidavit, which also incorporates all previous affidavits by reference, describes in detail the probable cause and necessity for extending the interception of communications on the target telephones. The affiant was CHP officer Michael Szatmari. Monson and Wharry were targets of prior wiretap orders. Canady and non-defendant Patton were new targets.

45

1    **1.    Probable Cause**

2        **a.    Markeith Canady**

3        Defendants contend that Wiretap 16-012 was not supported by probable cause sufficient to

4   intercept Canady's communications. (ECF No. 311 at 41.) However, the Affidavit indicates that law

5   enforcement intercepted numerous communications between Canady and previously tapped Target

6   Telephones in which human trafficking and potential gang violence were discussed. For example, agents

7   intercepted a call between Canady and Kiandre Johnson in which the two discussed trying to locate an

8   individual who had shot at Canady the night before. (16-012:45-46.) Canady was trying to get

9   information on the individual so that he could "do his own." The affiant noted that based on his

10  significant experience and the other context in the call, he believed that Canady intended to conduct a

11  retaliatory shooting. (16-012:47-48.) Likewise, Canady also communicated with La France Brown

12  (TT#8) about prostitution, indicating that he was planning to rent a hotel room to conduct prostitution

13  activities ("a P room") and invited Brown to split it with him. (16-012: 43-44.) Canady was using TT#21

14  and TT#22 to discuss his criminal activity, and therefore the interception of communications on those

15  lines was supported by probable cause.

16        **b.    Trenell Monson**

17        Monson argues that Wiretap 16-012 was not supported by probable cause that past crimes would

18  be discussed, since law enforcement had failed to get DPG members to talk on the phone about past

19  homicides and shootings. (ECF No. 346 at 68.) As detailed above, DPG members, including Monson,

20  did discuss shootings and gang violence in intercepted communications. (16-012:51-52 (intercepted

21  communication between Monson and Wharry where the two discussed Wharry showing a rival that he

22  was carrying a firearm during a verbal altercation at the mall); 16-012:57-58 (intercepted

23  communication between Monson and Kiandre Johnson discussing acquiring firearm ammunition).) The

24  16-012 Affidavit, along with the other affidavits, provided ample probable cause that Monson would use

25  his cellular phones, including TT#21 and TT#22, to discuss Target Offenses and other DPG gang

1    activity.

2        **2.    Necessity**

3        Defendants Monson, Canady, and Wharry challenge the necessity of Wiretap 16-012. Many of

4    the arguments raised with regard to whether Wiretap 16-012 was necessary are substantially similar to

5    the arguments that Defendants raised with respect to previous wiretap orders. The Court therefore

6    incorporates by reference its analysis of the necessity of previous wiretaps.

7        Defendants largely reiterate the objections made to prior wiretap orders, arguing that the

8    Affidavit does not contain specific investigative methods tried and failed since the prior wiretaps were

9    authorized. These contentions fail. The 16-012 Affidavit summarized the recent surveillance conducted

10   by law enforcement, the conversations intercepted as a result of Wiretap 16-012, including evidence

11   about three recent shootings. (16-012:30-35, 37-39, 45-50, 51-60.) The government can rely on past

12   facts and incorporate them into a current affidavit to support its contention that the necessity

13   requirement has been met. *Garcia Villalba*, 585 F.3d at 1231-32. The judge did not abuse his discretion

14   in determining that the necessity requirement was met as to Wiretap 16-012.

15       **3.    *Franks* Challenge**

16       Monson urges that the affiant misrepresented that the use of pen registers in this case would not

17   meet the goals of the investigation because a prior pen register search warrant application averred that a

18   pen register warrant "*would* reveal information necessary to successfully investigate and prosecute

19   Markeith Canady. . . ." (ECF No. 346 at 71.) The statements are not inconsistent. The standard for a

20   search warrant is that there is probable cause to believe that evidence will be obtained in a particular

21   place. The statement by the affiant in this wiretap affidavit was that he believed "the use of pen registers,

22   toll analysis, and subscriber information, without the aid of an electronic cellular telephone interception,

23   will not help achieve the objectives of the investigation." (16-012:90). Both statements can be true at the

24   same time. Law enforcement could believe that a pen register would provide evidence that would lead to

25   the successful prosecution of Canady and that it would not be able to provide enough evidence to further

1    their goal of dismantling the DPG. Even if the statements were inconsistent, Defendant's argument

2    certainly does not establish that either of the statements was intentionally or recklessly made. *United*

3    *States v. Valencia*, 24 F.3d 1106, 1108 09 (9th Cir. 1994) (defendant not entitled to *Franks* hearing

4    because he failed to establish that affidavit contained false statements or that allegedly false statements

5    were intentionally or recklessly made).

6    ## VII. <u>TECHNICAL CHALLENGES</u>

7    ### 1.    <u>Probable Cause for Precise Location Data</u>

8    Defendant Blackmon argues that Wiretap 16-001 exceeded the scope of the Affidavit and

9    application by authorizing "real-time GPS tracking." (ECF No. 333 at 20.) According to Blackmon, the

10   Affidavit did not set forth probable cause for GPS location tracking. (*Id.*) The Government responds that

11   the affidavits set forth ample facts in support of probable cause for GPS location search and seizure.

12   The 16-001 Affidavit provided a sufficient factual predicate for requesting GPS location data of

13   the affiants. First, the Affidavit describes multiple incidents for which establishing the Target Subject's

14   location would have provided evidence of the commission of a crime. The Government also points to

15   the necessity section of the Affdavit, where the affiant explains that officers could use the intercepted

16   communications to direct physical surveillance to the correct location and to identify the users of

17   telephones. (16-001:139-69, 176.).

18   Moreover, even if the location data search were not supported by probable cause, it would still

19   not be subject to suppression. 18 U.S.C. § 2515 provides that a wiretap must be suppressed:

20         (i) if the communication was unlawfully intercepted;
      (ii) the order of authorization or approval under which it was intercepted is

21         insufficient on its face; or
      (iii) the interception was not made in conformity with the order of

22         authorization or approval.

23   18 U.S.C. § 2518(10)(a). None of those scenarios apply here. As the Court has already discussed, the

24   interception of the communications was lawful. Therefore, the GPS location tracking data is not subject

25   to suppression under Title III. The only question then is whether the GPS location tracking authorized in

1   connection with the wiretap order is subject to suppression under the Fourth Amendment.[10]

2   　　　The Supreme Court has recognized a good faith exception to the exclusionary rule, which

3   provides that evidence will not be suppressed even when the search warrant is invalid if the officers who

4   obtained the evidence had a reasonable belief in its validity. *United States v. Leon*, 468 U.S. 897, 926

5   (1984). Although the good faith exception does not apply to unlawfully intercepted communications

6   under 18 U.S.C. § 2518(10)(a) when the applicant "failed to comply with the edicts of the federal

7   wiretap statute in procuring the order," *United States v. Lomeli*, 676 F.3d 734, 743 (8th Cir. 2012), it

8   does apply to the search of location data when officers had an objective, good faith belief in its validity

9   based on the facially valid order. *See United States v. Espudo*, 954 F. Supp. 2d 1029, 1043-44 (S.D. Cal.

10   2013); *United States v. Barajas*, 710 F.3d 1102, 1111 (10th Cir. 2013) (assuming global positioning

11   system (GPS) pinging of defendant's cellular phone was a search, investigators did not know that

12   warrant that permitted obtaining of GPS data, which was based on affidavit in support of wiretaps, was

13   invalid, and therefore, good faith exception applied). Because the officers who executed the search of

14   the location data did so in good faith subject to a facially valid order, the GPS tracking data is not

15   subject to suppression.

16   　　　**2.**　　**Incorporation of Prior Affidavits by Reference**

17   　　　Each wiretap affidavit submitted in this investigation incorporates all prior affidavits by

18   reference. Several defendants object to incorporating prior affidavits by reference, arguing that law

19   enforcement sought to impermissibly substitute prior findings of probable cause or necessity instead of

20   providing a new basis for authorizing the wiretap. (*See, e.g.*, ECF No. 323 at 7 (citing *United States v.*

21   *Gonzales*, 412 F.3d 1102, 1115 (9th Cir. 2005) ("each wiretap application must separately satisfy the

22   necessity requirement"); ECF No. 331 at 7 ("incorporation by reference is impermissible"). These

23   _____

24   [10] We assume for purposes of addressing Defendant's argument that the Government's acquisition of real time GPS tracking data constitutes a Fourth Amendment search. However, the Court notes that the law is unsettled. The Supreme Court recently

25   granted certiorari in *United States v. Carpenter*, No. 16-402, to decide whether the government needs a warrant to obtain GPS location data from cellphone companies.

arguments are inapposite. The affiant is permitted to incorporate facts adduced in prior affidavits by reference in a wiretap application or extension. *Garcia-Villalba*, 585 F.3d at 1232. Of course, Defendants are correct that the affiant cannot wholesale copy a prior affidavit in support of a spin-off wiretap or extension. Each application must contain sufficient case specific detail to support the probable cause and necessity findings. However, Defendants arguments that the wiretap orders are *per se* void because they incorporate prior affidavits by reference is incorrect as a matter of law. *Id.* (district court does not view a wiretap application "in a vacuum"); *see also* United *States v. Berrelleza-Leal*, No. CR12-62RSL, 2013 WL 1561876, at *5 (W.D. Wash. Apr. 11, 2013) ("Historical facts and earlier investigatory tactics described in previous applications, particularly within the same investigation, are almost always relevant"). To the extent that Defendants argue that a particular wiretap application is insufficient either because it lacks probable cause or a showing of necessity, the Court has addressed those arguments above. As indicated, each wiretap affidavit was supported by facts specific to this investigation that demonstrated probable cause and necessity.

### 3.   Use of Metered Devices

Monson argues that the government failed to use a metered recording device as required by California Penal Code § 629.80. As previously explained, wiretaps are not subject to suppression for failure to comply with state law as long as they comply with federal law. Second, the agents aver that the recording device used was in compliance with California Penal Code § 629.80's requirement that the device is "metered so as to authenticate upon review that interruptions occurred as set forth in." (Declaration of SA Mike Kennedy, ECF No. 417-6.)

### 4.   Failure to Disclose Prior Interceptions in Extension Applications

Several defendants contend that the 16-010 and 16-011 Affidavits, which requested the extension of prior wiretap orders, failed to disclose the results of the prior interception period in accordance with 18 U.S.C. § 2518(1)(f)(5). This is incorrect. Each wiretap affidavit after Wiretap 16-001 summarized the interceptions resulting from the prior wiretap extensively, and incorporated all previous affidavits,

1   detailing prior interceptions, by reference. (*See, e.g.*, 16-011:48-61.) The affidavits were consistent with

2   the mandate of 18 U.S.C. § 2518(1)(f)(5). Defendants' contentions lack merit.

3        **5.    Periodic Reporting**

4        Defendant Monson challenges the affidavits on the grounds that several required periodic reports

5   were not timely submitted. 18 U.S.C. § 2518(6) provides that the order may require reports to the

6   issuing judge showing progress towards the authorized objectives and need for continued interception.

7   The judge sets the interval required. *Id*. In this case, the Orders required periodic reports to be made at

8   ten day intervals. Although in some cases the periodic reports were *filed* after the interval period had

9   lapsed, each of the reports contested by Monson was timely *submitted* to the authorizing judge according

10   to the affidavits provided by the Government. Defendant has not submitted any information to the

11   contrary.

12        Moreover, even if the reports had not been timely submitted, late reports would not provide a

13   basis for suppression under the statute. Suppression is only warranted in three instances: (i) the

14   communication was unlawfully intercepted; (ii) the order of authorization or approval under which it

15   was intercepted is insufficient on its face; or (iii) the interception was not made in conformity with the

16   order of authorization or approval. 18 U.S.C. § 2518(10)(a)(i)-(iii). None of the three instances set forth

17   above would arise even if the periodic reports were not in strict compliance with the issuing judge's

18   order. Even if there had been a violation, suppression would not be warranted.

19        **6.    The District Attorney Qualifies as an Approved Applicant under Federal Law**

20        Defendant Blackmon argues that District Attorney Lisa Smittcamp does not qualify as an

21   applicant under the federal wiretap statute. (ECF No. 333 at 13.) There is no basis for this argument. 18

22   U.S.C. § 2516(2), which governs the validity of state issued wiretaps, explicitly authorizes "the principal

23   prosecuting attorney of any political subdivision" of the state to make the application, as long as they are

24   authorized to do so by state law. A district attorney is authorized under California Penal Code 629.50 to

25   make an application for an order authorizing the interception of wire and electronic communications. As

the district attorney of Fresno County, Lisa Smittcamp was authorized by statute to make an application to a state court judge for an order intercepting electronic communications.

### 7.    Wiretap Orders Were Authorized By A Judge With Statutory Authority

Defendant Maxey argues that the wiretaps are defective because the applications were not made to the presiding judge, in violation of California Penal Code § 629.50. (ECF No. 354 at 27.) He is incorrect. California Penal Code § 629.50(a) provides that application may be made to "the presiding judge or one other judge designated by the presiding judge." Contrary to Maxey's contention, the issuing judge does not need to make a determination regarding the unavailability of the presiding judge for the order to be valid. "An ordered list of additional judges may be authorized by the presiding judge to sign an order authorizing interception." *Id.* Fresno County Superior Court Presiding Judge Kimberly A. Gaab, in an Order dated January 6, 2016, designated Judge Arlan Harrell "under the authority of Penal Code section 629.50, et seq. . . . to consider, authorize, authorize and supervise all applications presented pursuant to said section." (Bates 77638). Therefore, the wiretap applications and orders were not invalid.

## VIII. CONCLUSION AND ORDER

For the foregoing reasons, Defendants' motions to suppress the wiretaps and for a *Franks* hearing (ECF Nos. 311, 323, 325, 329, 331, 332, 345, 350, 353, 354, 355, 357, 359, 362, 363, 364, 368, 369, 372, 375, 379, 380, 386, 389, 392, 394, 431, 436, 446, 448, 451, 452) are DENIED.

IT IS SO ORDERED.

Dated:   **September 29, 2017**            **/s/ Lawrence J. O'Neill**
                                    UNITED STATES CHIEF DISTRICT JUDGE